**BRICKLAYERS AND STONE MASONS UNION, LOCAL NO. 2, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Associated General Contractors of Minnesota, Intervenor.**

**No. 76–1595.**

United States Court of Appeals, District of Columbia Circuit.

Argued 8 June 1977.

Decided 9 Aug. 1977.

Samuel I. Sigal, Minneapolis, Minn., with whom Stephen D. Gordon, St. Paul, Minn., was on the brief, for petitioners.

Andrew F. Tranovich, Atty., N.L.R.B., Washington, D.C., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of Court, with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Michael S. Winer, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondent.

Larry A. Hanson, St. Paul, Minn., with whom A. Patrick Leighton, St. Paul, Minn., was on the brief, for intervenor.

Vincent J. Apruzzese, Springfield, N.J., filed a brief on behalf of Associated Gen. Contractors of America, as amicus curiae, urging denial of petitioner's petition for review.

Before WRIGHT and WILKEY, Circuit Judges, and WILLIAM B. JONES,* United States Senior District Judge for the United States District Court for the District of Columbia.

Opinion for the court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

This case arises on the petition of Bricklayers and Stone Masons Union, Local No. 2, Bricklayers, Masons and Plasterers' International Union of America, AFL–CIO (the Bricklayers); Construction and General Laborers Local 563, Laborers' International Union of North America, AFL–CIO (the Laborers); International Union of Operating Engineers, Twin City Local No. 49, AFL–CIO (the Engineers); and Plumbers Union Local No. 15, United Association of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO (the Plumbers). The petition for review [1] seeks to have set aside a decision and order of the National Labor Relations Board (the Board) issued on 17 June 1976, which found that the four Unions had violated Section 8(e) of the National Labor Relations Act (the Act).[2] There is also before the court a

---

* Sitting by designation pursuant to Title 28, U.S.C. § 294(c).

1. The case is properly before this court pursuant to Section 10(e) and (f) of the National Labor Relations Act, 29 U.S.C. §§ 160(e), 160(f).

2. 29 U.S.C. § 158(e). Section 8(e) provides:
It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construc-

cross-application by the Board for enforcement of the order issued against the Bricklayers, Laborers, Engineers, and Plumbers.

We note at the outset that the court has been materially assisted by particularly able briefs and arguments of counsel, whose obvious competence in this field of law enabled them to dispense with wasteful attention to unessentials. After careful consideration of how the law applies in this case, we affirm the order of the Board and grant the cross-application for enforcement for the reasons stated herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Facts*

The facts as found by the Board are not in dispute. During the summer of 1973 the Elk River, Minnesota School District contracted with Gunnar I. Johnson & Son, Inc. (Johnson) as general contractor, Gorham Construction Company, Inc. (Gorham) as prime mechanical contractor, and Design Electric, Inc. (Design) as prime electrical contractor for constructing an elementary school. Johnson employed members of the Bricklayers, Laborers, and Engineers and Gorham employed members of the Plumbers, all of which unions are affiliates of the AFL–CIO. Design, however, employed members of the Christian Labor Association, Local No. 84, an independent organization not affiliated with AFL–CIO.[3]

Work began at the construction site in August 1973. On 24 October the International Brotherhood of Electrical Workers, Local No. 110 (Electrical Workers), an affiliate of the AFL–CIO, caused a sign to be posted at the construction site stating:

> Notice to the Public—Electrical Work Being Performed on This Job is at Substandard Wages and Benefits by Design Electric—This Notice is for Information of the Public and is not Intended to cause any Person to Refuse to Pick Up or Deliver or to Perform any Service—IBEW L.U. # 110.

Employees of Johnson and Gorham, appearing for work at their usual starting time, left the jobsite upon seeing this sign and refused to perform any work thereon.

The Associated General Contractors of Minnesota (AGC) represents Minnesota contractors, including Johnson, in contract negotiations with the construction trades unions.[4] After the Electrical Workers' sign was posted, AGC recommended that Johnson establish reserved gates to isolate the dispute. Johnson then posted signs at the construction site, designating the east gate for the employees and suppliers of Johnson and Gorham, the neutral employers, and the west gate for the employees and suppliers of Design, the primary employer. Thereafter, the Electrical Workers picketed the west gate *only*.[5] Except for a short time on 31 October 1973,[6] the Johnson and Gorham

---

tion, alteration, painting, or repair of a building, structure, or other work: *Provided further*, That for the purposes of this subsection and subsection (b)(4)(B) of this section the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further*, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.

The Charging party before the Board was the Associated General Contractors of Minnesota

(AGC). AGC is an Intervenor on the side of the Respondent Board in this case.

The Decision and Order of the Board are reported at 224 N.L.R.B. No. 132. The Decision and Order also appear in the Joint Appendix (J.A.) at 20–49. References to the Decision of the Board will hereinafter be to the Decision as it appears in the Joint Appendix.

The case was heard before a three member panel of the Board. Chairman Murphy and Member Pennelo were in the majority, with Member Fanning dissenting.

**3.** Decision of the Board, J.A. at 22–23.

**4.** *Id.* at 23.

**5.** *Id.*

**6.** *Id.* at 24 n. 3.

employees refused to enter the east gate, reserved for Johnson and Gorham, until their work stoppage was enjoined by the District Court on 28 March 1974.[7]

On 1 March 1974, AGC, Johnson, and Gorham jointly filed a complaint in the United States District Court for the District of Minnesota against the four Unions, seeking a temporary restraining order against their members from refusing to work upon the jobsite. The complaint also sought an order requiring the Unions to arbitrate the dispute in accordance with the mandatory arbitration provisions in their respective contracts. On 28 March 1974, the court, finding "concerted action by [the Unions] and their members to effect a work stoppage on the project," granted a temporary restraining order and directed the parties' to arbitrate the dispute.[8] The order also required the Unions to post notices at the project indicating that they did not condone the work stoppage, and that the collective bargaining agreements required all members to return to work.[9] The Unions complied with the order, and work resumed at the project on 29 March 1974.[10]

### B. The Arbitrator's Ruling

In April 1974 AGC, Johnson, and Gorham and the Unions arbitrated the meaning of the picket line clauses contained in their respective contracts.[11] The picket line clauses in the contracts of the Bricklayers, Laborers, and Operating Engineers stated:[12]

PICKETS, BANNERS AND STRIKES. The Employer may not request or instruct any Employee except Watchmen or Supervisory personnel to go through a picket line except to protect life or property. The Unions agree that there shall be no cessation of work or any recognition of picket lines of any union without first giving prior notice to the Employer or his Association.

The picket line clause in the Plumbers' contract was worded differently:[13]

Refusal to pass through a lawfully permitted picket line will not constitute a violation of the agreement.

Before the arbitrator the Unions maintained that their members' refusal to enter the jobsite through the neutral gate was protected by the picket line clauses and that the work stoppage was not secondary activity. The Employers argued that the picket line clauses, under the Unions' construction, were secondary boycott provisions violative of Section 8(e) of the Act.

On 5 June 1974 the arbitrator decided that the Johnson and Gorham employees could determine that the primary picket line of the Electrical Workers at the Design gate actually existed at the Johnson and Gorham neutral gate, and their decision not to enter the jobsite through the Johnson and Gorham neutral gate was protected under the picket line clauses.[14] In rejecting the contention that no picket line existed at the neutral Johnson and Gorham gate, the arbitrator found:[15]

7. *Id.*

8. *Id.* at 24; 90, 98.

9. *Id.* at 24; 98.

10. On appeal by the Unions, the United States Court of Appeals affirmed this decision. *Associated Gen. Contractors of Minnesota v. International Union of Operating Engineers, Twin City Local No. 49*, 519 F.2d 269 (1975).

11. The neutral arbitrator in this proceeding was Thomas Gallagher.
   Under the doctrine announced in *Spielberg Manufacturing and Harold Gwenberg*, 112 N.L.R.B. 1080 (1955), the Board ruled that, if "the [arbitration] proceedings appear to have been fair and regular, [if] all parties had agreed to be

bound, and [if] the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act," the arbitrator's award will be recognized. 112 N.L.R.B. at 1082. Such is not the case here since the Board did find that the arbitrator interpreted the picket line clauses in a manner repugnant to Section 8(e) of the Act. *See Banyard v. NLRB*, 505 F.2d 342, 345–46 (1974).

12. Decision of the Board, J.A. at 25.

13. *Id.*

14. Decision and Award of Arbitrator, J.A. at 71–72.

15. *Id.* at 69.

The question whether a picket line exists [at the Johnson and Gorham gate] is one of fact. The evidence presented at the hearing established that the individual employees resolved that question of fact by deciding that the picket observed was a picket that they would honor. . . .
The neutral arbitrator finds, therefore, that the decision to regard the Local 110 [Electrical Workers'] banner as a picket line affecting them was a decision made by the individual employees who refused to work and that the decision was one that they might reasonably make under these circumstances. The employees themselves have decided that a picket line exists even at the neutral gate. The neutral arbitrator holds that the picket line clause protects that decision as one reasonably made and not contrary to law.

He also found that "none of the Unions had taken the position or attempted to enforce or apply an illegal picket line clause within the meaning of the proscription of Section 8(e) of the Federal Act." [16]

On the next day (6 June 1974) the Unions posted almost identical notices to their members advising them of the arbitrator's decision and stating: [17]

Accordingly, under our contract, you have the right to decide whether or not to work on this job in the presence of the Electricians Local 110 banner. It is up to you to decide whether to honor or not the Electricians' banner.

Thereafter AGC filed unfair labor practice charges against the Unions alleging that the picket line clauses violated Section 8(e) of the Act.[18] On 30 August 1974 AGC, Johnson, and Gorham also filed a motion with the District Court to vacate the arbitrator's award, alleging that the underlying contracts violated Section 8(e).[19] On 23 December 1974, the District Court denied the motion to vacate and deferred the Section 8(e) issue to the Board.

## C. The Decision of the Board

The Board found that the picket line clauses of the Bricklayers, Laborers, Engineers, and Plumbers were in violation of Section 8(e) of the Act. The Board found that the picket line clauses of all four Unions were "entered into" under Section 8(e) for the purposes of Section 10(b)'s six month statute of limitations by consistently maintaining the position, accepted by the arbitrator, that these clauses protected their members from discipline for refusing to enter the job site through the neutral gate at the Elk River School District project.[20] The Board found that the picket line clauses in the contracts of the Bricklayers, Laborers and Operating Engineers violated Section 8(e) as written because the clauses on their face were broad enough to sanction refusals to cross secondary picket lines.[21] The Board further concluded that all four picket line clauses, including the Plumbers' clause, violated Section 8(e) when they were construed by the arbitrator to protect employees from discipline for refusing to pass through a neutral gate when a primary picket line was stationed elsewhere on the common work situs.[22] The Board also concluded that these picket line clauses, as interpreted, were not saved from illegality under Section 8(e) by the construction industry proviso to that Section.[23]

Thus, in issuing the order here under review, the Board decided four issues emanating from the dispute described in Part I. A., supra: 1) that the relevant portions of the contract clauses in issue were "enter[ed] into" within the time period specified in Section 10(b) of the Act; 2) that the picket line clauses in the contracts of the Laborers, Bricklayers, and Engineers were per se vio-

16. J.A. at 134. (Letter of Arbitrator Gallagher).

17. Decision of the Board, J.A. at 27.

18. Id.

19. Id.

20. Id. at 39–40.

21. Id.

22. Id. at 40.

23. Id. at 37–39.

lative of Section 8(e); 3) that the picket line clauses in all four Union contracts (including that of the Plumbers) were, as interpreted by the arbitrator, violative of Section 8(e); and 4) that the picket line clauses in all four contracts were not saved by virtue of the construction industry proviso to Section 8(e). We agree with the Board on all four points, and we shall examine each of these issues in this order in our analysis which follows.

## II. ANALYSIS

### A. *Statute of Limitation*

■ Section 10(b) of the Act states that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board. . . ."[24] Section 8(e) makes it an unfair labor practice for an employer and a union "to enter into" a so-called "hot cargo" clause;[25] this section has been interpreted to cover the reaffirmation or reentering into of a hot cargo clause within the six month limitation period prescribed in Section 10(b).[26] Since the picket line clauses at issue in this case were executed outside the Section 10(b) period, reaffirmation of the clauses within the Section 10(b) period is a precondition to unfair labor practice liability.

The Board found that the picket line clauses had been reaffirmed within the Section 10(b) period because the Unions had consistently "maintained . . . the continued enforceability of [the] clauses" during the course of the arbitration proceedings, and, of course, willingly accepted and sought to utilize the broad interpretation of the clause accorded by the arbitrator. In drawing this conclusion, the Board relied on its repeatedly articulated position that reaffirmation of a disputed clause can be "evidenced by arbitration proceedings

wherein the parties are disputing the interpretation to be given that clause."[27]

■ The Unions attack the Board's finding as to reaffirmation on two grounds: First, the Unions contend that there was no reaffirmation because they were compelled to proceed to arbitration by an order of the District Court. In the Unions' view, they were reluctant and unwilling participants in the arbitration proceedings and therefore did not voluntarily "enter into" an agreement within the meaning of Section 8(e). Secondly, the Unions seek to set aside the finding as to reaffirmation by pointing to the decision of the arbitrator construing the picket line clauses as protecting only lawful primary conduct, not employee refusals to honor an illegal secondary picket line. That is, the Unions contend that their activities were outside the section 10(b) period because of the arbitrator's decision that the clauses were not illegal. We reject both of the arguments put forth by the Union with respect to the reaffirmation of the picket line clauses.

The Unions' argument that there was no reaffirmation because the arbitration proceeding was compelled by an order of the District Court is deficient in several respects. This argument does not contest the notion that arbitration proceedings can serve as sufficient evidence of reaffirmation; rather, the Unions contend that they must be legally excused from the consequences of their reaffirmation because they were "acting under compulsion of a presumptively valid Court order. . . ."[28] Thus, the Unions' argument is one based on the unfairness of having to defend the picket line clauses in an arbitration proceeding in which they did not desire to participate. This argument ignores the fact that the Unions had contractually agreed to the arbitration procedure that was implemented

---

**24.** 29 U.S.C. § 160(b).

**25.** 29 U.S.C. § 158(e).

**26.** *See e.g., District 9, International Ass'n of Machinists v. NLRB*, 114 U.S.App.D.C. 287, 315 F.2d 33, 35 (1962).

**27.** Decision of the Board, J.A. at 31 and cases cited in footnote 9.

**28.** Petitioners' Brief at 26.

by the District Court order.[29] Thus, although it is true that the Unions did not desire to arbitrate this *particular* dispute, they had bound themselves to the arbitration concept in their contracts with their employers. This decision of the Unions to insert an arbitration clause in their respective contracts was presumably arrived at as the result of an arms-length bargaining process in which all parties to the contract exercised the prerogatives attendant to the concept of freedom of contract.

The Unions suggest that the order of the District Court coerced them into a defense of the picket line clauses before the arbitrator and that this coercion violates the due process rights of the Unions.[30] To the extent that a coercion argument would have any relevance in this context, it would have to focus on the bargaining process leading to the inclusion of the arbitration clauses in the various contracts. No such coercion is alleged or suggested by the Unions; given this, the order of the District Court emerges simply as a technique to effectuate the intent of the parties as embodied in their contractual understanding.

■ In addition to the argument that the District Court's order somehow represented an unwarranted coercion of the Unions to arbitrate the dispute, the Unions suggest that the mere fact that there was an arbitration proceeding forced them to defend the picket line clauses as being lawful. That is, the Unions contend that AGC's conduct in bringing the unfair labor practice charge which eventually led to the court-ordered arbitration "invited and caused the asserted [reaffirmation]."[31] The Unions appear to believe that their position with respect to the lawfulness of the picket line clauses was dictated by the

conduct of the charging party, and that, therefore, they should not be held legally responsible for the reaffirmation of the clauses before the arbitrator.

This is, of course, a mistaken belief; the Unions were free to pursue any arguments or lines of reasoning they chose to at the arbitration proceeding. While in practical terms it may be inevitable that a union will defend the legality of its actions once a dispute arises and arbitration commences, the Unions cannot be heard to disclaim responsibility for its position merely because another party initiates action to trigger the contractually-based arbitration procedures. Thus, the Unions are fully responsible for the position they took in defending the legality of their members' actions and this defense constitutes a reaffirmation of the disputed clauses under well-established precedent.[32] For the Unions to attempt to escape responsibility for their position by presenting a defense of coercion or compulsion is to attempt to deny the employers the rights granted to them in the bilateral contracts.[33]

As the second ground for attacking the Board's finding of reaffirmation, the Unions argue that there was no reaffirmation because the arbitrator interpreted the clauses as applying to lawful activity.[34] In this argument, the Unions appear to draw a distinction between the reaffirmation of a lawful picket line clause and the reaffirmation of an unlawful picket line clause; in the Unions' view, the former does not constitute a reaffirmation for purposes of the Section 10(b) statute of limitations. The Unions' position is, in effect, that they had no intent to reaffirm an *illegal* picket line clause; the assumption is that the Unions

---

29. *See* Decision of the District Court, J.A. at 97 (Finding of Fact # 15).

30. Petitioners' Brief at 26.

31. *Id.*

32. See note 28, *supra.*

33. It is worth noting that the Unions were not reluctant or unwilling to accept the substantive decision of the arbitrator and to implement it

by advising their members that they could choose whether or not to enter the neutral gate. It was only after the Board decided that the arbitrator had misinterpreted the law that the Unions have sought to escape responsibility for their view that the picket line clauses protected the Union members' activity here at issue.

34. Petitioners' Brief at 27–29; Petitioners' Reply Brief at 8–10.

would not have reaffirmed the clauses if they had known them to be illegal. Since the Board found the clauses to be illegal *after* the reaffirmation before the arbitrator, the Unions believed that the reaffirmation cannot be attributed to them.

The Board pierced and destroyed this argument quite accurately and thoroughly when it stated that the Unions' position

> goes to the merits of the alleged violation and not to the question of whether [the Unions] have reaffirmed the clauses. Indeed, [the] position contains its own admission that [the Unions] continue to reaffirm the effectiveness of the clauses— albeit only against primary activity.[35]

Reaffirmation and legality represent two distinct analytical concepts and two distinct stages of analysis in this context, each with different concerns and purposes underlying them.

■ The Unions appear to misconceive the concerns underlying the reaffirmation concept. In analyzing a reaffirmation question, a court will look to see if there are "acts of continued enforcement of a contract"[36] in order to determine if the relevant party is insisting upon the continued viability and legality of the clause. If the party continues to rely on the disputed clause, it is then appropriate for another party to instigate an unfair labor practice charge in order to resolve a contrary interpretation of the clause which he may entertain. Under the terms of Section 10(b), if such a charge is filed within six months, the Congressionally chosen time constraints have been satisfied.

In the context of this case, the charging party (AGC) could with confidence be assured by the position taken by the Unions before the arbitrator and by their actions taken thereafter in advising their members of the members' "right" to engage in a work stoppage that the Unions continued to insist and believe that the picket line clauses protected the members from discipline or discharge. Under such conditions, the charging party could be confident that it was not initiating a conflict resolution process in which the party being charged no longer adhered to its disputed contractual interpretation. The actions taken by the Unions (for which actions they are fully responsible)[37] indicate clearly that the Unions reaffirm their position that the picket line clauses protected the choices of the individual members not to enter the neutral gate.

■ The subjective intent or evaluation of the parties as to the legality of the disputed clauses is irrelevant to the question of whether the parties have manifested a reaffirmation of the clauses. The question of the legality of contractual clauses is vested in various bodies at different stages in the resolution of a dispute—the arbitrator, the Board, and the courts are vested with the authority to make these legal determinations with varying degrees of finality. Reaffirmation serves the purpose of ensuring that a dispute is properly before one of these bodies for decision; it does not depend on the substantive legal decision reached by one of the bodies or on the subjective speculation of the parties as to the question of legality.

■ Therefore, the Unions' argument that there was no reaffirmation because the Unions and the arbitrator believed the clauses to be lawful as applied is irrelevant. What is relevant is that there were identifiable acts of reaffirmation which convince us that the disputed clauses were reentered into within six months of the filing of the charges by AGC.

### B. *Facial Invalidity*

The Board found that the picket line clauses in the contracts of the Laborers, Bricklayers, and Engineers were violative of Section 8(e) on their face.[38] The Board

---

35. Decision of the Board, J.A. at 31–32.

36. *Kennedy v. Sheet Metal Workers*, 289 F.Supp. 65, 82 (D.Cal. 1968).

37. *See* text and notes at notes 28 to 36, *supra*.

38. Decision of the Board, J.A. at 32–33.

has repeatedly held that to the extent that picket line clauses are "broad enough to apply to secondary picketing having no connection with disputes concerning jobsite subcontracting, [such clauses are] prohibited by Section 8(e) . . . ."[39] It is clear that the clauses of the Laborers, Bricklayers, and Engineers are broad enough, on their face, to apply to such prohibited conduct. In this appeal the Unions state that for the purpose of the argument here the three clauses can be taken to be "overly broad on their face."[40]

The picket line clause in the Plumbers' contract, which refers only to refusals "to pass through a *lawfully* permitted picket line,"[41] does not suffer from the same facial invalidity as do the other clauses, and this distinction was properly recognized by the Board.[42] The controversy before the court at this time does not focus on this issue of facial invalidity; rather, the parties disagree as to the legality of the four clauses as interpreted and applied by the arbitrator.

## C. *Interpretation and Application of the Picket Line Clauses*

The Board found that the picket line clauses in the contracts of all four unions violated Section 8(e) as interpreted and applied by the arbitrator. We agree with the Board's conclusion.

In analyzing the question of the legality of the picket line clauses, we agree with the Unions that it is "necessary to ascertain whether the activity sought to be protected by the contract constitutes secondary activity under the Act."[43] While the Unions have correctly identified this major concern, they have at times *focused on the wrong*

*activity* (the *primary* activity at the Design Electric gate) in presenting their arguments to this court.[44] *It is vital that the analysis be focused on the activity which is the object of the dispute and the resulting unfair labor practice charge. The relevant activity to be examined is the refusal of the individual employees to enter the neutral gate of the Johnson and Gorham employers.* All the parties agree that the picket line established at the Design Electric gate by Local 110 was lawful primary activity; this characterization does not, however, advance the analysis of the nature and character of the activity that took place at the neutral gate. It is this activity directed at Johnson and Gorham, the neutral employers, that controls our disposition of this case. With the focus now set on the proper sphere of underlying conduct sought to be protected by the disputed contractual clauses, we may now turn to an exposition and application of the relevant legal principles to this conduct.

■ Analysis of the picket line clauses as interpreted by the arbitrator must begin with the well established principle that separate contractors working on a construction site are not engaged in a joint enterprise, but instead retain their independent status.[45] In particular, on the Elk River project there were no contractual relationships at all between Johnson, Gorham and Design Electric. Each contractor was on the project under contract with the School District as a result of being the successful bidder pursuant to competitive bidding required by Minnesota law on public projects.

■ Simply because contractors are on a common construction site, a Union may not

---

**39.** *Hodcarriers' and Construction Laborers' Union Local 300, International Hodcarriers' Building and Common Laborers' Union of America, AFL–CIO (Jones & Jones, Inc.),* 154 N.L.R.B. 1744, 1745 n. 7 (1965).

**40.** Petitioners' Reply Brief at 8 n. 6.

**41.** See note 13, *supra* (emphasis added).

**42.** Decision of the Board, J.A. at 32–33.

**43.** Petitioners' Brief at 31.

**44.** The Unions have at times attempted to shift the area of inquiry to the conduct of Local 110 at the Design Electric gate. *See, e.g.,* Petitioners' Brief at 32, 34, 36; Petitioners' Reply Brief at 4, 5. Union counsel appeared to retreat from this position at oral argument.

**45.** *See NLRB v. Denver Bldg. & Construction Trades Council,* 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

picket or strike a neutral contractor because the Union has a dispute with another prime contractor on the construction site. The concept of separate gates is now well established as a means of isolating the dispute to the primary contractor, thus to avoid enmeshing the neutral contractor in the dispute. With the concept of separate gates in operation, it follows that a picket line at the neutral gate is the same in law as a picket line at a totally different job site, i. e., it must be justified (or not) by whatever is going on at that job site or behind that neutral gate. By definition a neutral gate is for employees of neutral—uninvolved—employers. It follows, therefore, that a picket line on a construction site maintained at the neutral employer's gate constitutes secondary activity and is therefore a violation of Section 8(b)(4)(B) of the Act.[46] Picket line clauses which seek to protect such secondary activity are in violation of Section 8(e) of the Act.[47]

Under Section 8(e) an agreement between a neutral employer and a Union that Union members can refuse to handle goods ("hot cargo") produced by an employer whose employees are on strike is an unfair labor practice. Similarly, under Section 8(e) an agreement allowing the employees of a neutral employer to strike in support of a primary strike is also an unfair labor practice. While the triggering event in such a case is a primary strike or dispute

between the struck employer and its employees, the secondary strike or refusal by the employees of the neutral employer to handle the goods is secondary activity, with the objective of causing the neutral employer to cease to do business with, or to refuse to handle the goods of, the struck employer.[48]

A similar analysis is appropriate with respect to determining whether picket line clauses are void under Section 8(e). While the picket maintained by Local 110 at the Design gate was primary as to Design, there is no disagreement that the same picket, if stationed at the Johnson-Gorham neutral gate, would be secondary because the primary dispute was with Design. It cannot be disputed that the picket line clauses would *not* protect the Union members in refusing to cross a picket line maintained by Local 110 at the neutral gate.

■ The arbitrator, in his decision, apparently decided that Local 110 was in some manner picketing at the Johnson and Gorham gate, as well as at the Design gate.[49] While somewhat confusing, the arbitrator appears to say the contract clauses allow the employees to determine that a picket exists at a location where in fact one does not exist (at the Johnson-Gorham gate), and then to refuse to cross that non-existent picket line. However, any picket line maintained by Local 110 at the Johnson-Gorman gate—whether deemed "factual," "imagi-

**46.** Section 8(b)(4)(B) provides:
  (b) It shall be an unfair labor practice for a labor organization or its agents—
  \*   \*   \*   \*   \*   \*
  (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
  \*   \*   \*   \*   \*   \*
  (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer,

or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

**47.** *See Moore Dry Dock Co.,* 92 N.L.R.B. 547 (1950).

**48.** *See Local 761, International Union of Electrical Radio and Machine Workers v. NLRB,* 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

**49.** See note 15, *supra.*

nary," or otherwise—*any* such picket line would be a secondary picket line. The designation of a "neutral gate" is precisely to avoid a picket line being placed at such neutral gate, *i. e.*, to say that there is no reason or legal right for any picket line to be placed here, because this gate is to be used by employees of an employer who, it is agreed, has no connection with a dispute going on elsewhere. Thus the picket line clauses as interpreted and applied by the arbitrator were clearly in violation of Section 8(e) as having authorized in advance a refusal to cross a secondary picket line.

In support of their position that the picket line clauses were interpreted to protect only lawful activity in this case, the Unions characterize the conduct of their members as "a lawful *response* to primary activity" [50] and as "permissible secondary *effects* of lawful primary activity." [51] The Unions contend that "the nature of the activity giving rise to the effect is the critical point of inquiry." [52] That is, the Unions would have us focus on the primary activity at the Design Electric gate, activity which is admitted to have been legal by all parties to this case. Since the refusal of the employees to enter the neutral gate can be said to have had its genesis in this lawful activity, the Unions believe that the refusal to enter through the neutral gate must be accorded lawful status because it is a "response" to or an "effect" of the legal primary activity at the Design Electric gate.

The theory put forth by the Unions is both analytically unsound and contrary to national labor policy. Perhaps this is best seen by reference to the Unions' reply brief, wherein they sum up the heart of their argument, "The relevant focus of the inquiry for purposes of Section 8(e) is the character of *underlying conduct* sought to be protected, rather than its net result. Where, as here, the underlying conduct is lawful primary activity, enforcement of contractual language protecting such activi-

ty through arbitration must be deemed lawful." [53] The fatal flaw in this argument is that, while the underlying conduct sought to be protected is claimed to be the lawful primary activity, analytically this is not accurate. It is true that the picket protection clause *also* includes a protection of lawful primary activity at the Design Electric gate, and this is a legitimate objective, but the picket protection clause here includes an attempted protection of conduct at the neutral gate for Johnson and Gorham employees. *This* is the "underlying conduct," the conduct of the Johnson-Gorham employees at the neutral gate, which is sought to be protected here.

This is what the dispute is all about. The "underlying conduct" which is "sought to be protected" here is not the primary picket line at the Design Electric gate, but the "responses" to the "lawful primary activity," *i. e.*, the refusal to enter at the neutral gate. There is nothing sought by either the Unions or the employers, nothing in dispute, which will affect in any way the picket line at the Design Electric gate, or the response of Design Electric employees or other workers to that picket line at that gate. It was uncontradicted at oral argument that the underlying conduct here in dispute and sought to be protected by the picket protection clause was indeed the conduct, the response, of the individual workers at the neutral gate; otherwise, there is no purpose to this case.

▮▮▮▮ This "response," this "underlying conduct," at the neutral gate cannot be other than secondary conduct, whether the picket line be conceived of as "imaginary" or established there by live persons. It cannot be protected by the picket clause, because secondary conduct, whether in response to legitimate primary activity or in response to illegitimate secondary activity (for example, picket line, real or imaginary), is illegal under both 8(b)(4)(B) and 8(e). The failure to limit the picket clauses

---

**50.** Petitioners' Brief at 34.

**51.** *Id.* at 35.

**52.** *Id.* at 36.

**53.** Petitioners' Reply Brief at 7 (emphasis supplied).

to *lawful* responses makes them *per se* unfair labor practices.

A contrary decision would undermine the right of the independent contractors to remain neutral in a labor dispute in which they were not involved. Unless national labor policy is changed so as to abrogate this right,[54] we must analyze cases such as this one with this right to remain neutral as a factor in the analysis.

The Unions also contend that the arbitrator's interpretation of the picket line clauses is outside the reach of Section 8(e) because the clauses protect only individual refusals to cross picket lines, not union-induced refusals.[55] In the Unions' view, if there is no evidence of inducement, the clauses "cannot be said to sanction [secondary conduct.]."[56] However, inducement, whether by unions or individuals, is simply not an element of a Section 8(e) violation. Section 8(e) prohibits the entering into of *contract terms* sanctioning a secondary boycott. This court reached this conclusion in *Truck Drivers Union, Local No. 413 v. NLRB*, holding that "there is no merit to the union's suggestion that this case is outside the reach of Section 8(e) because it protects individual refusals, not union-induced refusals. We read our own cases as having rejected this argument. . . ."[57] To engraft inducement as an element of a Section 8(e) violation would resurrect *Local 1976, Carpenters v. NLRB (Sand Door)*,[58] the decision which Congress overruled in enacting Section 8(e) as part of the Landrum-Griffin Amendments to the Act.[59] In *Sand Door* the Supreme Court held that, while the secondary boycott provisions prohibited union inducement of employees to refuse to handle goods or perform services to force their employer to cease doing business with another employer, they did not proscribe a voluntary agreement between an employer and a union to boycott another employer. Section 8(e) was enacted to remedy this loophole in the statutory scheme by prohibiting voluntary agreements to engage in secondary boycott conduct.[60]

In summary, the arbitrator's interpretation of the Unions' picket line clauses sanctions impermissible secondary conduct in ruling that the employees of the neutral contractors Johnson and Gorham could decide that a picket line existed at the neutral gate and that it was permissible for them to refuse to work. The Board properly refused to permit the Unions to do "by indirection what they can't obtain directly, that is, achieve contractual protection for the employees when refusing to enter the premises of a neutral employer because another employer is involved in labor problems on the same jobsite."[61] The refusal to enter the neutral gate cannot be considered lawful activity without doing violence to the careful balance of the rights and responsibilities of unions and employees as delineated by the Supreme Court in *NLRB v. Denver Bldg. and Construction Trades Council.*[62]

### D.  *The Construction Industry Proviso*

Congress exempted from Section 8(e) those agreements "between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work". The Board found that the picket

---

54.  The labor movement has long sought legislation to allow the picketing of all employers on a common work site when there is a dispute with one employer. Such common situs picketing legislation has not, however, become law. The extended efforts to secure such a law as detailed in Brief for the Respondents at 26–27.

55.  Petitioners' Brief at 38–41, 39 n. 13.

56.  Petitioners' Reply Brief at 4 n. 3.

57.  334 F.2d 539, 543 (1964), *cert. denied*, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186.

58.  357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

59.  *See National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

60.  *Id.*

61.  Decision of the Board, J.A. at 36.

62.  See note 45, *supra*.

line clauses here under review were not saved from illegality by the construction industry proviso, which "as an exception to the Landrum-Griffith Act's overriding aim to prohibit secondary boycotts is [to be] strictly construed." [63]

In making construction site hot cargo clauses lawful, Congress left standing the Supreme Court's decision in *NLRB v. Denver Bldg. Trades Council*,[64] which declared unlawful the picketing of a neutral employer on the construction site with the object of making the project an all-union job. Congress made clear its intention that such construction site clauses could only be enforced by lawsuits and not by strikes or other economic action.[65]

The instant picket line clauses, as interpreted by the arbitrator, immunize employees of neutral·employers from discipline or discharge for refusing to work on a construction site whenever there is a primary picket line somewhere on the site. The neutral employers will be subjected to strike (economic) pressure to seek the removal of the offending primary employer from the construction site whenever their employees adopt the course sanctioned by their collective agreement. In the *Muskegon Bricklayers* case, the Board stated: [66]

> We can see no difference in practical effect in terms of prohibited self-help between a situation where a union induces employees to strike after employer violations of a lawful "hot cargo" clause in order to remedy such breach, clearly unlawful action, and a situation where, in order to prevent such breach, the union tells the employees that if the employer should violate the "hot cargo" clause in the future the employees may cease work with impunity. The latter is the effect of Respondent's proposed "hot cargo" clause.

While it is true that the Unions here did not expressly urge their members to strike in support of the Electrical Workers Union's protest, the operation of the picket line clauses in conferring advance permission to Union members to refuse to work has the same effect as if the Unions had urged a strike. Thus, under the arbitrator's interpretation, the picket line clauses look to the Unions' members to enforce these secondary picket line clauses through economic self-help action and not to judicial enforcement, as Congress intended when it legitimized hot cargo clauses in the construction industry. Indeed, the negotiation of picket line clauses permitting employees to refuse to cross secondary picket lines with impunity contemplates, as the Sixth Circuit indicated in similar circumstances, "strike action sanctioned by the union in advance rather than at the moment of breach." [67]

■ In summary, the instant picket line clauses, which are designed to insure that union standard wages are paid by all of the multiple employer contractors on any construction project where the Unions' members are employed, are secondary boycott provisions. In providing that employees can honor secondary picket lines without being disciplined, the clauses sanction work stoppages to enforce the Unions' objectives. This sanctioning of economic pressure takes these clauses outside the narrow construction industry exemption and therefore the clauses violate Section 8(e) of the Act.

## CONCLUSION

■ The Unions' arguments in this case are based on misconceptions as to the proper analytical stance to assume when examining the undisputed facts of the case. A properly focused analysis of the facts in this case must center on the actions of the indi-

---

**63.** *Drivers, Salesmen & Helpers, Local 695 v. NLRB*, 361 F.2d 547, 553 n. 23 (D.C.Cir.1966).

**64.** See note 45, *supra*.

**65.** *See, e. g., Orange Belt District Council of Painters No. 48 v. NLRB*, 117 U.S.App.D.C. 233, 328 F.2d 534 (1964).

**66.** 152 N.L.R.B. at 365–66.

**67.** *NLRB v. Muskegon Bricklayers*, 378 F.2d 859, at 864, enforcing 152 N.L.R.B. 360.

vidual Union members in refusing to enter the neutral gate on the Elk River construction site. The Board concluded, and we agree, that this action was illegal secondary conduct. Since the Unions had entered into and reaffirmed the validity of picket line clauses which were interpreted as sanctioning this impermissible secondary activity, the clauses must fall as being violative of Section 8(e) of the Act. Accordingly, the Unions' petition for review is denied and the Board's cross-application for enforcement is granted.

*So Ordered.*