**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GLAZIERS AND GLASSWORKERS LOCAL UNION NO. 1621, a/w International Brotherhood of Painters and Allied Trades, Respondent.**

**No. 79–7445.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 3, 1980.

Decided Oct. 10, 1980.

William R. Stewart, Washington, D.C., for petitioner.

Robert E. Jesinger, Brundage, Beeson & Pappy, Los Angeles, Cal., Wylie, Leahy, Blunt & McBride, San Jose, Cal., for respondent.

Before WALLACE and SKOPIL, Circuit Judges, and EAST,* District Judge.

WALLACE, Circuit Judge:

We are asked to consider whether a union violates section 8(b)(1)(A) of the National Labor Relations Act (Act), 29 U.S.C. § 158(b)(1)(A), when it disciplines its members who work for a neutral employer at a construction site. Finding that the National Labor Relations Board (Board) reasonably determined that the union's disciplinary action was contrary to national labor policy, and hence was not a purely internal matter beyond the reach of section 8(b)(1)(A), we enforce the Board's order.

I

This case arises from a 1977 labor dispute between Local 316 of the United Brotherhood of Carpenters and Joiners of America (Carpenters) and R. D. Martin & Sons (Martin). Martin was the general contractor in the construction of a roller skating rink in San Jose, California. The disciplined employees, Ginestra and Bentley, worked for Alameda Glass and Mirror Company (Alameda), one of the subcontractors on the project. The dispute between Martin and Carpenters led to a strike and picketing at the construction site on March 11 and 12 and on March 14 through 30. Both the strike and the picketing were sanctioned by three area Building and Construction Trades Councils of the AFL–CIO.

Martin responded to the picketing by setting up two separate entrance gates, one for the use of its own employees and suppliers (known as a primary reserved gate), and another for the use of employees and suppliers of other firms, including Alameda (known as a neutral reserved gate). This action forced the union to restrict its picketing to the primary reserved gate or face charges that it was coercing neutral employers in violation of the Act's prohibition against secondary boycotts. *See, e. g., Markwell and Hartz, Inc. v. NLRB, 387*

F.2d 79 (5th Cir.1967), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968); *NLRB v. Nashville Bldg. & Constr. Trades Council,* 383 F.2d 562 (6th Cir.1967); *Orange Belt District Council of Painters Local 48 v. NLRB,* 361 F.2d 70 (D.C.Cir.1966). Although Carpenters picketed at both gates on March 11 and 12, from March 14 to 30 it restricted its picketing to the primary reserved gate. The legality of Carpenters' picketing is not at issue.

This dispute began when William Brown, a business representative of Glaziers and Glass Workers Local Union No. 1621, a/w International Brotherhood of Painters and Allied Trades (Glaziers), observed Ginestra and Bentley at work on the construction site. Even though both employees entered the site through the neutral reserved gate, each was notified that Brown had brought charges against them for working at a project where members of Carpenters were picketing. Although the notice was dated March 30, the last day of picketing, the employees did not receive the notice until after they had completed work on the project. After a hearing before the executive board of Glaziers, Ginestra and Bentley were found guilty of violating union bylaws and assessed fines of $300 each.

The Board found that Glaziers' disciplinary action against Ginestra and Bentley restrained and coerced them in the exercise of their section 7 rights within the terms of section 8(b)(1)(A). 242 N.L.R.B. No. 134 (1979). Section 7 guarantees employees the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection," as well as the right to refrain from such activities. 29 U.S.C. § 157. We will first discuss the meaning and scope of section 8(b)(1)(A), after which we will confront Glaziers' arguments against the Board's order.

II

Although section 8(b)(1)(A) purports to protect employees against restraint or coer-

---

* Honorable William G. East, United States District Judge, District of Oregon, sitting by designation.

cion in their decision to refrain from the union's concerted activities, the Supreme Court has not read the provision as prohibiting all apparently coercive disciplinary action against union members who fail to abide by union bylaws requiring support of concerted action. *See NLRB v. Retail Clerks Union, Local 1179*, 526 F.2d 142, 144 (9th Cir.1975). Relying on legislative history and the text of section 8(b)(1)(A)'s proviso, "the Court has held that [section 8(b)(1)(A)] does not affect the union's conduct of purely internal affairs." *Id.* at 145. The obligations of union membership are thus viewed as contractual in nature, and "[t]he consensual basis of union membership makes its disciplining of members not coercive within the meaning of section 8(b)(1)(A)." *Id.; see Scofield v. NLRB*, 394 U.S. 423, 428–30, 89 S.Ct. 1154, 1157–1158, 22 L.Ed.2d 385 (1969); *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 192–95, 87 S.Ct. 2001, 2012–2014, 18 L.Ed.2d 1123 (1967).

■ One of the crucial questions in section 8(b)(1)(A) cases has thus become whether the allegedly coercive action of the union involves its purely internal affairs. Although neither courts nor the Board will judge the wisdom or fairness of a particular union rule, they will inquire into whether the rule reflects legitimate union interests. The Supreme Court has established that "if the rule invades or frustrates an overriding policy of the labor laws the rule may not be enforced . . . ." *Scofield v. NLRB, supra*, 394 U.S. at 429, 89 S.Ct. at 1158. When application of a union rule is found to run contrary to national labor policy, "the disciplinary action is regarded as coercive within the meaning of section 8(b)(1)(A)." *NLRB v. Retail Clerks Union, Local 1179, supra*, 526 F.2d at 145. Enforcement of such a rule, whether by fines or by expulsion from membership in the union, is an unfair labor practice. To summarize, a union may "enforce a properly adopted rule

which reflects a legitimate union interest, impairs no policy Congress has embedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." *Scofield v. NLRB, supra*, 394 U.S. at 430, 89 S.Ct. at 1158.

## III

■ The Board found that the enforcement of a union rule prohibiting union members from working for a neutral employer at a construction site tends to frustrate the national labor policy against secondary boycotts embodied in section 8(b)(4)(B) of the Act. 29 U.S.C. § 158(b)(4)(B).[1] Glaziers offers several interrelated arguments designed to distinguish its disciplinary action from those that violate section 8(b)(1)(A). In general, these arguments misapprehend the scope of section 8(b)(1)(A) and seek to avoid the obvious conclusion that Glaziers was attempting to institutionalize collective secondary pressure through its disciplinary machinery.

Glaziers challenges the Board's reasoning by attacking the Board's statement that it would have found that the imposition of these fines violated section 8(b)(4)(B) of the Act had a charge been brought under that provision. As these fines were levied after the picketing had ceased and after Alameda had completed its work on the job, Glaziers argued to the Board that the challenged fines had no secondary effects at all. Indeed, Glaziers contended that by the time the fines issued, there was no longer an existing business relationship between Martin and Alameda within which secondary pressure could occur.

The Board responded to these arguments by finding that the "cease doing business" element of section 8(b)(4)(B) embraces prospective as well as current business relationships, so that a labor organization may be liable if it "induce[s] or encourage[s]"

---

**1.** The relevant portion of section 8(b)(4)(B) states that it is an unfair labor practice for a labor organization or its agents to "induce or encourage any individual . . . to engage in, a strike . . ., where . . . an ob-ject thereof is—forcing or requiring any person to . . . cease doing business with any other person . . . ." 29 U.S.C. § 158(b)(4)(B).

individuals to strike against a neutral employer even when the primary employer is not yet known. 29 U.S.C. § 158(b)(4)(B). Glaziers contends that interpreting section 8(b)(4)(B) to reach prospective as well as current business relationships unduly expands the reach of the provision, such that, for example, it could be applied to the single act of a shop foreman generally exhorting union members never to work for neutral employers at a common situs. In turn, Glaziers argues that unions must have at least the power to teach union members their moral duty of loyalty to fellow union people. Glaziers reasons that, as the Board's section 8(b)(4)(B) theory underpins its section 8(b)(1)(A) finding, the latter holding collapses when the section 8(b)(4)(B) theory is thus undermined. Glaziers concludes that the act of fining Ginestra and Bentley invades the policies underlying section 8(b)(4)(B) only remotely, if at all, and that it therefore falls within the internal affairs exemption to section 8(b)(1)(A).

We need not pass upon the Board's view that section 8(b)(4)(B) applies to prospective business relationships, however, to sustain its conclusion that Glaziers acted inconsistently with that provision. Ginestra and Bentley were charged with working "behind a picket line recognized by the Building Trades Council." As Ginestra and Bentley each entered the site through the neutral reserved gate, it is clear that the unions have construed this rule to require members to recognize and honor a constructive or imaginary picket line at the neutral gate of a picketed common situs. Cf. Bricklayers Local 2 v. NLRB, 562 F.2d 775, 785–86 (D.C.Cir.1977) (any picket line at a neutral gate—factual, imaginary, or otherwise—constitutes an illegal secondary picket line).

The union rules themselves required their distribution to every member. Therefore we assume that Ginestra and Bentley knew but ignored the rule in question. By maintaining this rule, Glaziers encouraged Ginestra and Bentley, albeit unsuccessfully, to place secondary pressure on Alameda—in violation of section 8(b)(4)(B).

Glaziers' next arguments proceed from the unstated premise that unions may legitimately discipline members for refusal to participate in concerted activities unless the underlying activity violates the labor laws. Glaziers' reasoning requires us not to assume, as we did above, that Ginestra and Bentley had advance notice of the rule or the threat of union discipline, and hence were not directly induced or encouraged to engage in a secondary boycott. Even if there were no section 8(b)(4)(B) violation, however, we would be compelled to reject Glaziers' contentions. We have made it clear that the Board may properly find that union discipline sufficiently impaired national labor policy to constitute a section 8(b)(1)(A) violation even though the underlying concerted activity was legal. *NLRB v. Retail Clerks Union, Local 1179, supra,* 526 F.2d 142. In *Retail Clerks Union,* two employees were fined for refusing to participate in a sympathy strike in support of picketing that was eventually determined to be illegal recognitional picketing under section 8(b)(7) of the Act. Despite the acknowledged legality of the sympathy strike, and the union's legitimate interest in encouraging members to support its lawful concerted activity, we found it controlling that the union continued its efforts to discipline the strikebreakers even after the Board had ruled that the picketing supported by the strike was illegal. We concluded that "the union's continuing efforts to discipline those members who failed to observe the picket lines tends to impair the policy . . . expressed in section 8(b)(7) of the Act." *Id.* at 147.

It is even clearer that union discipline of members who elect to work for neutral employers impairs the policy against the application of secondary pressure. The District of Columbia Circuit has held that contractual picket–line clauses protecting employees who treat neutral gates as if those gates were guarded by imaginary picket lines sanction secondary boycott activity in violation of section 8(e) of the Act. *Bricklayers Local 2 v. NLRB, supra,* 562 F.2d at 784–86. Similarly, to allow unions to en-

force an internal rule against working for a neutral employer at a construction site would be to give legal sanction to the institutionalization of the imaginary picket line by the use of an ever–present threat of union discipline, a result hardly consonant with the policies underlying section 8(b)(4)(B). We find in this use of coercive union discipline a section 8(b)(1)(A) violation because, as in *Bricklayers, supra,* "[a] contrary decision would undermine the right of the [secondary employer] to remain neutral in a labor dispute in which [it is] not involved." 562 F.2d at 787.

ENFORCED.