LESCHER BUILDING SERVICE, INC., Plaintiff-Appellant,

v.

LOCAL UNION NO. 133 OF the SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, Defendant-Appellee.

No. 13694.

United States Court of Appeals Seventh Circuit.

Nov. 7, 1962.

Jerald E. Jackson, Frank H. Byers, LeForgee, Samuels, Miller, Schroeder & Jackson, Decatur, Ill., for appellant.

Donald W. Fisher, Toledo, Ohio, Donald W. Morthland, Henson, Morthland & Henson, Decatur, Ill., Mulholland, Robie & Hickey, Toledo, Ohio; James E. Henson, Richard F. Morthland, Decatur, Ill., of counsel, for appellee.

Before HASTINGS, Chief Judge, and CASTLE and SWYGERT, Circuit Judges.

HASTINGS, Chief Judge.

This action was brought by Lescher Building Service, Inc. (plaintiff) to recover damages for an alleged violation of § 303(a) (4) of the Labor Management Relations Act, 1947, Title 29, U.S.C.A. § 187(a) (4), which reads in pertinent part as follows:

"(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—* * *

"(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade,

craft, or class rather than to employees in another labor organization or in another trade, craft, or class * * *."

Defendant is Local Union No. 133 of the Sheet Metal Workers International Association.

A jury trial resulted in a verdict in plaintiff's favor on which the trial court entered judgment for plaintiff. On February 14, 1962, pursuant to defendant's motion, the trial court set aside the verdict and judgment thereon and entered judgment for defendant notwithstanding the verdict. Plaintiff appeals from this judgment.

■ A motion for directed verdict or for judgment notwithstanding the verdict raises a question of law as to whether there is any evidence which, if believed by the jury, warrants a verdict against the party making the motion, and in deciding such motion the court must consider the evidence in the light most favorable to the party against whom the motion is directed. Cartwright v. Traylor Bros., Inc., 7 Cir., 288 F.2d 196 (1961); Bell v. Pennsylvania Railroad Company, 7 Cir., 284 F.2d 297 (1960); Euson v. Starrett, 7 Cir., 277 F.2d 73 (1960). Accordingly, the following narrative is drawn from the evidence favorable to plaintiff.

Plaintiff is a general contractor engaged in the sale and construction of prefabricated metal buildings known as Butler buildings. Fred Lescher, plaintiff's president, testified that plaintiff makes out of state purchases yearly in the amount of one hundred fifty to two hundred thousand dollars. He further stated that in the past plaintiff has received material from Birmingham, Alabama and that the raw material corrugated by Butler (plaintiff's supplier) at its Galesburg, Illinois plant comes from steel mills throughout the country. Lescher testified that plaintiff had in the past sold two buildings outside the State of Illinois. Contrary to the finding of the district court, we conclude that plaintiff established it was engaged in business "affecting commerce" within the meaning of Section 303(a) of the Act.

Plaintiff subcontracts the actual construction of these buildings to Lescher Construction Service, Inc., and other work, such as plumbing, to other subcontractors. Fred Lescher is president of and owns a controlling interest in both plaintiff and Lescher Construction Service, Inc. This latter corporation did the actual work of constructing and erecting a building for the Cloyd Market in Decatur, Illinois, where the alleged cause of action arose and employed and paid for the required labor.

The Butler building involved in this case was constructed by placing corrugated steel panels on an iron framework. Prior to 1959, the corrugations on Butler panels were 13½ inches apart. In that year the panels were changed so that the corrugations were less than 5 inches apart.

In an agreement entered into in 1952 between the Sheet Metal Workers International Union and the Iron Workers International Union, it was agreed that where the centers of the corrugations were more than 5 inches apart, the work of erection was that of sheet metal workers and that where the centers of corrugations were less than 5 inches apart, the work of erection was that of iron workers. The centers of corrugations on the panels involved in the Cloyd Market job were less than 5 inches apart. Under the 1952 agreement the erection of the panels on the Cloyd Market building would have been assigned to Iron Workers Union.

Prior to September 4, 1959, M. D. Chadwick of Lescher Construction Service, Inc. directed a composite crew of sheet metal workers and iron workers to report to the Cloyd Market job site to unload the materials for the job, which work was done. On this date, Forrest English, business representative for Iron Workers Union, notified Lescher Construction Service, Inc. that Iron Workers Union was claiming all the work of installing Butler rib panels. Sheet Metal Workers Union claimed the same work.

On September 8, 1959, plaintiff called a meeting in an attempt to settle the dispute. The meeting was attended by Forrest English, representing the iron workers, Thomas Bradshaw, defendant's business representative and Fred Lescher, president of plaintiff.

Thomas Bradshaw testified that during the course of this meeting he made a statement to the effect that unless the work on the job at Cloyd's Market was given to the sheet metal workers that he would banner or picket the job. The unions could not agree on a compromise solution. As a result, Fred Lescher,[1] relying on the 1952 agreement between Sheet Metal Workers International Union and Iron Workers International Union, awarded the work on the Butler rib panels to Iron Workers Union. Forrest English testified that after this assignment was made he overheard Bradshaw say he "would picket the job."

Pursuant to the work assignment, the iron workers proceeded to place the Butler rib panels on the iron framework. On September 14, 1959, when the panels were being applied, a single picket appeared at the Cloyd Market site carrying a banner which read "Lescher Bldg. Service, Inc. has reassigned sheet metal work on this job in defiance of a directive from the National Joint Board—Sheet Metal Workers Local 133."[2] The picket was a member of defendant union and was placed at the Cloyd Market job site under the direction of defendant's business representative. The picket was withdrawn from the job site on September 17, having been there for a period of four days.

The iron workers' business representative testified that when the picket appeared on the first day the following occurred: "The iron workers' Steward called me up and asked me what to do about the picket line out there, and I told him not to honor it that the procedural rules outlawed jurisdictional picketing and we were bound not to honor that picket, to ignore it." The iron workers' business representative testified further that he "objected [to Bradshaw] to a picket line being on the job. It was against the procedural rules that we agreed on to put a picket on the project to try and tie the job up."

Robert Smith, plumbing contractor on the Cloyd Market job testified he began work in August, 1959 and completed his contract the following December. He did no work on September 14, the day the picket appeared, although there was work on the job which could have been done. With respect to his employees, Smith was asked: "Why did they not work on the Cloyd Market job, if you know, the week of September 14, 1959?" Smith answered: "Well, they wouldn't cross a picket line."

Fred Lescher testified that he had communicated with some of the subcontractors and found out that they were not working "[b]ecause their employees were Union employees and would not cross the picket line to work."

In November, 1959, plaintiff had contracted to erect a Butler building for the Wagner Malleable Casting Corporation. Fred Lescher testified that defendant's business representative called him to inquire how plaintiff was going to per-

1. The complaint, which was sworn to by Fred Lescher, states that plaintiff made the assignment. At trial, Lescher testified that he could not remember which corporation—plaintiff or Lescher Construction Service, Inc.—made the assignment.

2. When the Iron Workers Union first claimed all the panel work, plaintiff sent a telegram to the National Joint Board for the Settlement of Jurisdictional Disputes which stated in substance that the business representative of the iron workers informed plaintiff it could have no men unless all the work on Butler rib panels was assigned to iron workers. The reply, which was received after the assignment of the work to iron workers, instructed plaintiff to proceed on the basis of the original assignment. Defendant apparently interpreted "original assignment" to mean that the work should be assigned to composite crews—half iron workers and half sheet metal workers—which had been plaintiff's practice prior to the Cloyd Market job.

form the work on the Wagner job. When the business representative was told by Lescher that plaintiff would perform the work the same way as on the Cloyd job, the business representative "said he would perform the same way he had on the Cloyd job." A statement of similar import, with respect to the Wagner job, was made to the iron workers' business representative by defendant's business representative.

The start of the Wagner job was delayed two weeks because "[t]he Wagner officials did not want any labor problems by any of their contractors working on their work, so they told us [plaintiff] to hold off until we got it settled."

At the Cloyd Market job, the iron workers ignored the picket and continued work on the Butler rib panels during the four days he was present. No other employees worked during these four days.

In an effort to have the picket removed, plaintiff hired the law firm of Woollen, Byers & Brown. Fred Lescher estimated that he spent 300 hours trying to get the labor matters settled, and that this time would otherwise have been devoted to selling new jobs. Plaintiff's business dropped from 88 jobs in 1959 to 40 jobs in 1960.

■ Sections 303(a) and (b) of the Labor Management Relations Act, 1947, 29 U.S.C.A. §§ 187(a) and (b), the sections involved in the instant case, make certain conduct unlawful and give a cause of action to any person injured by a violation thereof. Under section 8(b) (4) of the Act, 29 U.S.C.A. § 158(b) (4), the same conduct is made an unfair labor practice. In fact, section 303(a) has been amended by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, to state merely that the conduct defined as an unfair labor practice in section 8(b) (4) is unlawful. Thus, the law which has developed under § 8(b)

(4) is relevant to a private suit under § 303(a).[3]

■ In order for plaintiff to recover, it must be proved that defendant engaged in a strike or induced or encouraged the employees of any employer to cease work with the object of requiring plaintiff to assign particular work to defendant's members rather than to the iron workers.

The evidence fails to show that defendant struck, and plaintiff has never claimed that defendant did so. From the evidence, the jury was entitled to infer that the ultimate objective of defendant's conduct was to require plaintiff to reassign the work on the Butler rib panels to defendant's members. The district court held, inter alia, that while defendant's objective was to require a reassignment, plaintiff failed to prove defendant used unlawful means—inducing or encouraging employees to cease work—to attain its ultimate objective.

■ When it is shown that the ultimate objective of picketing is to require an employer to assign particular work to one union rather than another and a work stoppage occurs as a result of such picketing, a violation of § 303(a) (4) has been established. International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952).

In the instant case, however, there is no evidence of a work stoppage. It is undisputed that the iron workers continued work and finished the Cloyd Market job. Robert Smith, the plumbing contractor, testified his employees did not work because "they wouldn't cross a picket line." This may not be taken as evidence that his employees had refused to work on the Cloyd Market job because of the presence of the picket. The evidence does not show that any of Smith's employees even knew of the picket. So far as the evidence shows, Smith's state-

3. However, the statutory requirement that the findings of fact made by the National Labor Relations Board are to be accepted if supported by substantial evidence on the record considered as a whole permits a broader scope of review of the Board's findings then does the test applied to a jury's verdict as in the instant case.

ment was based on his own personal knowledge of the picket and his own conclusion that his employees "wouldn't cross a picket line" should the occasion arise where they would be required to do so to reach their place of employment. In its most favorable light, Smith's testimony shows nothing more than possible inducement of an employer which is not proscribed conduct under § 303(a) (4). Rabouin v. National Labor Relations Board, 2 Cir., 195 F.2d 906 (1952). Fred Lescher's testimony with respect to his communications with other subcontractors is in the same category as Smith's testimony.

■ It is not necessary to prove a union was successful in bringing about a work stoppage in order to prove the union induced or encouraged employees to cease work. An attempt to induce or encourage is all that need be proved. Superior Derrick Corporation v. N. L. R. B., 5 Cir., 273 F.2d 891 (1960), cert. denied, Seafarers' Intern. Union of North America, etc. v. N. L. R. B., 364 U.S. 816, 81 S. Ct. 47, 5 L.Ed.2d 47; National Labor Relations Bd. v. Associated Musicians, 2 Cir., 226 F.2d 900 (1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483. Nevertheless, where a work stoppage does not occur, more than mere presence of a picket line must be shown. N. L. R. B. v. Business Machine & Office Appliance Mechanics Conference, AFL-CIO, 2 Cir., 289 F.2d 62 (1961); National Lab. Rel. Bd. v. Business Mach. & Office A., etc., 2 Cir., 228 F.2d 553 (1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (The charging party in this case was the Royal Typewriter Company, and this case will hereafter be referred to as the Royal Typewriter case); Douds v. Local 50, etc., 2 Cir., 224 F.2d 49 (1955).

In the Royal Typewriter case, the union was charged with an unfair labor practice in violation of § 8(b) (4) (A), 29 U.S.C.A. § 158(b) (4) (A), the so-called secondary boycott section of the Act. The union had a dispute with its primary employer, Royal Typewriter, and went on strike. In order to enforce its demands, the union picketed some of Royal's customers. This picketing occurred before the entrances to large office buildings through which Royal's customers' employees passed on their way to and from work. There was no evidence that any of Royal's customers' employees ceased work. On the basis of this evidence, the Board found an unfair labor practice. The court held that while the picketing was "clearly secondary" and the object of the picketing was proscribed by § 8(b) (4) (A), the evidence was insufficient to support a finding of specific intent to induce or encourage employees to cease work or a finding that the natural and probable consequence of the union's activities was a work stoppage by Royal's customers' employees. The court concluded by saying: "Since we find in this case neither intent to induce, nor effective inducement, nor even probable inducement of employees, we conclude that there is no substantial evidence to support the Board's finding of unlawful inducement and encouragement of employees in violation of § 8(b) (4) (A)." Id. 228 F.2d at 561.

■ In the instant case, the court below aptly stated: "Thus, the mere fact that a picket was present, absent any pressure by word of mouth, and absent any refusal of employees to cross a picket line and absent any influence on employees to cease work, it cannot be said to amount to unlawful inducement." The same can be said of the threats to picket the Wagner job which can not be taken to show more than the possible presence of a picket. Furthermore, it is not shown that any employees, with the exception of the iron workers, even knew of the presence of the picket, and under the circumstances of this case no inference may be drawn that the picket was intended to induce or encourage the iron workers who were at loggerheads with defendant over the work assignment. *No employee was called to testify* as to any inducement or encouragement which might have been directed at him by defendant.

The Royal Typewriter case stands for the proposition that where a work stop-

page does not occur as a result of the union's activities, there must be proof that the union's specific intent was to induce or encourage employees or proof that the natural and probable consequence of the union's activities was a work stoppage. In the instant case, there is no proof of either of these elements.

For the foregoing reasons, we hold that the district court did not err in setting aside the verdict of the jury and vacating the judgment for plaintiff and entering judgment for defendant.

In view of our disposition of this case for the reasons hereinabove assigned, we deem it unnecessary to pass upon the validity of any other grounds assigned by the district court in support of its judgment, and we expressly refrain from so doing.

The judgment of the district court is affirmed.

Affirmed.