**Chambersburg BOROUGH, Petitioner**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted June 6, 2014.

Decided Dec. 4, 2014.

Scott T. Wyland, Harrisburg, for petitioner.

John B. Neurohr, Chief Counsel, and Warren R. Mowery, Jr., Assistant Counsel, Harrisburg, for respondent.

John R. Bielski, Philadelphia, for intervenor International Association of Fire Fighters Local 1813.

BEFORE: RENÉE COHN JUBELIRER, Judge, and MARY HANNAH LEAVITT, Judge, and ROCHELLE S. FRIEDMAN, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

In these consolidated appeals, Chambersburg Borough (Borough) petitions for review of the Final Order of the Pennsylvania Labor Relations Board (Board) dismissing the Borough's exceptions and making absolute and final the Proposed Decisions and Orders entered in Case Nos. PF–C–11–174–E and PF–C–12–40–E.[1] The Borough asserts that the Board erred by: (1) failing to find that the labor organization representing the Borough's firefighters committed an unfair labor practice by coercing volunteer firefighters into refraining from responding to fires in the Borough; and (2) by finding that it committed an unfair labor practice when it disciplined its shift captain for issuing, on behalf of the labor organization, a letter coercing the volunteer firefighters into refraining from responding to fires. Because we conclude that the Board erred, we reverse.

Local 1813 Union (Union) is a chapter of the International Association of Fire Fighters (IAFF),[2] and serves as the bargaining unit for twenty-one full-time firefighters employed by the Borough. (Final Order at 1.) The Borough and the Union had a collective bargaining agreement (CBA) in effect which governed their employment relationship through the beginning of 2012. (Final Order at 2.)

In addition to paid firefighters, the Borough's fire department utilizes the services of four volunteer fire companies: Franklin Fire Company No. 4 (Franklin); Junior Hose and Truck Company No. 2 (Junior Hose); Goodwill Fire Company No. 3 (Goodwill); and Cumberland Valley Fire Company No. 5 (Cumberland Valley). (Final Order at 1.) Junior Hose, Goodwill, and Cumberland Valley all operate out of the Borough's fire station, and use Borough-owned equipment. (Final Order at 2.) Franklin operates from its own separate building located in the Borough and uses its own equipment. (Final Order at 2.) Franklin is the only company in the Borough that has heavy rescue equipment, which is capable of freeing people who are trapped in vehicles or buildings. (Final Order at 2.) The Borough does not exert any administrative control over the Franklin volunteers. (Final Order at 2.) None of the active volunteers at Junior Hose, Goodwill, or Cumberland Valley are members of the IAFF. (Final Order at 2.) Franklin has fourteen active volunteers who respond to calls within the Borough, and twelve of those active volunteers are also members of the IAFF because of their full-time positions as paid firefighters "of larger municipal fire departments in Virginia or the District of Columbia, or on federal installations." (Final Order at 2.) The Borough has a mutual aid agreement

---

1. The Board issued one Final Order in these matters.

2. The International Association of Fire Fighters, Local 1813, filed notices of intervention with this Court and is an Intervenor in these appeals.

with Franklin, effective from 2007–2012, whereby Franklin is authorized to respond to emergencies within the Borough. (Final Order at 2.)

In July 2011, during negotiations for a successor CBA between the Borough and the Union, the Borough informed the Union that the Borough would need to downsize the number of paid firefighters due to budget constraints. (Final Order at 2.) The Borough formally notified the Union by letter on July 25, 2011 that, " 'effective nine (9) months from the date of this notice, the Borough will either simply decrease its firefighting capabilities or transfer much of the primary responsibility for firefighting and suppression to other potential fire service providers.' " (Final Order at 2 (quoting Letter from William F. McLaughlin to Patrick Martin (July 25, 2011) at 2, R.R. at 358a).)

At the time of the negotiations, Patrick Martin was employed as a shift captain in the Borough's fire department, and was also president of the Union. (Final Order at 2; Proposed Decision and Order, Case No. PF–C–11–174–E (Order PF–C–11–174–E) at 2.) IAFF membership "is voluntary and obligates the firefighters to abide by the IAFF Constitution and Bylaws." (Final Order at 2.) "[A]n IAFF member violates the IAFF Constitution if he or she provides volunteer fire services to a municipality that has [furloughed] its paid firefighters who are represented by the IAFF." (Final Order at 3.) This type of violation is considered misconduct under the IAFF Constitution and "any member of the IAFF may file internal union charges against another IAFF member who engaged in misconduct." (Final Order at 3 n. 4.) After a review process, a penalty may be imposed upon the IAFF member, "which includes a temporary or

permanent suspension in membership status in the IAFF." (Final Order at 3 n. 4.)

After Martin received the July 25, 2011 notification from the Borough stating its intent to decrease the number of paid firefighters, Martin and the Union's executive board decided that the IAFF members should be notified via a letter of the Borough's intent to furlough Borough firefighters (Letter). (Final Order at 2.) Before sending the Letter, Martin met with the volunteer fire chief of Franklin, Mark Trace,[3] on October 24, 2011, regarding the proposed layoffs. (Final Order at 3 n. 5.) Chief Trace memorialized this meeting in a memorandum that stated as follows:

> [The Union] will be sending out letters to roughly 200 union firefighters living in Franklin and part of Cumberland Counties REQUESTING that you do not volunteer on calls in the [Borough]. This request does not concern you riding calls other than those calls inside the [Borough] and is not a formal charge of any kind. Due to IAFF regulations/policies/procedures, your local union will receive a copy. Again[,] this is a request out of respect for your union brother and not a formal charge of any type. NOW with that being said, if you continue to volunteer on runs into the [Borough], [the Union] will file formal charges with the IAFF to have disciplinary actions taken against you. I am not a lawyer or big union contract guy but I believe that the worst of those charges would be that you loose [sic] your union card.
>
> This leaves you with a decision to make. Do you or do you not ride calls into the [Borough]? As the Fire Chief, I promise you that you will not receive disciplinary action from the Franklins if you

---

**3.** Chief "Trace is a paid firefighter for the Washington, D.C. fire department and is a member of IAFF Local 36." (Final Order at 5 n. 7.)

choose not to respond on calls into the [Borough].

(Final Order at 3 n. 5.)

Two days later, Martin sent the Letter, dated October 26, 2011, to two hundred members of the IAFF residing "in Franklin County and the southern portion of Cumberland County," including twenty-four IAFF members who provided volunteer fire services for Franklin fire company. (Final Order at 3–4.) "None of the volunteers at [Cumberland Valley], [Goodwill], or [Junior Hose] received the [L]etter because they were not IAFF members." (Final Order at 4 n. 6.) The full text of the Letter is as follows:

As you know, current economic and political strife within the United States has placed great stress upon state and local governments, forcing them to find alternative means to support and provide funding for their respective infrastructures. As a direct result, municipal based public safety entities have borne the brunt of the budgetary scrutiny as has already been evidenced in the states of Wisconsin, New Jersey, and Ohio.

Regrettably, I am compelled to inform you that the Borough of Chambersburg is facing a similar reality. Recently, the Borough informed our membership that[ ] it intends to reduce the Chambersburg Fire Department's career staffing or transfer much of the primary responsibility for firefighting and suppression to potential fire service providers. It seems likely that the Department will achieve these goals by more heavily relying upon volunteer departments, with which it has existing relationships in the form of mutual aid agreements.

Many of you, by now, are likely experiencing circumstances similar to ours—

being forced to face the realities of providing financial stability and security to your families in these uncertain economic times. Therefore, I respectfully request your support as a member of the International Association of Fire Fighters, and ask that you adhere to the Constitution and By–Laws of our great union by refraining from providing volunteer fire fighting services to the Borough of Chambersburg. We are abundantly aware that such a request in some form may place stress upon you and your personal interests. Many of you currently volunteer in areas that are unable to provide adequate means of fire and public safety, and our request is in no means meant to criticize or diminish your efforts and commitment to your communities. However, collective, mutual support is fundamental to the security of all who possess membership within the IAFF, and this support is necessary to protect the jobs of our local members.

In closing, we greatly appreciate your consideration and assistance in this matter and would like to emphasize that the Greater Chambersburg Area Paid Fireman's Association, IAFF Local 1813[;] will pursue any avenue of action that is both necessary and legal for the continued security of our members and their families as well as yours.

(Final Order at 4 (quoting Letter from Patrick Martin to IAFF Members (Letter) (October 26, 2011), Hearing Joint Exhibit C).) Thereafter, the record shows that internal misconduct charges were brought against ten Franklin volunteers, who are also members of the IAFF, for continuing to volunteer in the Borough.[4] (Hearing Joint Exhibit Q, R.R. at 379a–98a.)

---

4. As an example, one of these ten Franklin volunteers against whom internal charges

were filed was Chief Trace. (Hearing Joint Exhibit Q, R.R. at 379a–80a.) The internal

On November 4, 2011, the Borough issued a memo to Martin informing him that he was under investigation for misconduct as a result of the Letter. (Final Order at 5.) Following a formal hearing the Borough informed Martin, by letter dated February 1, 2012, that he had been suspended from his employment for two hundred and forty hours. (Final Order at 6.) The Statement of Charges specifically cited the Letter as the basis for his suspension. (Final Order at 6.) On March 1, 2012, the Union "requested binding grievance arbitration regarding the Borough's decision to suspend Martin." (Final Order at 6 n. 9.) Martin appealed to the Borough's Civil Service Commission, which upheld Martin's suspension in an Order dated May 25, 2012. (Final Order at 6 n. 9.)

The Borough also filed a charge of unfair labor practices against the Union[5] based on the issuance of the Letter and an official complaint was issued by the Board's Secretary (Secretary) on April 16, 2012 as Case No. PF–C–11–174–E, alleging that the Union violated Sections 6(2)(d) and 6(2)(e) of the Pennsylvania Labor Relations Act (PLRA).[6] (Chambersburg Borough's Unfair Labor Practice Complaint and Notice of Hearing, Case No. PF–C–11–174–E (Borough's Complaint), R.R. at 3a, 15a–18a.) On March 9, 2012, the Union filed a charge of unfair labor practices against the Borough based on the Borough's disciplinary action against Martin, alleging that the Borough violated Sections 6(1)(a) and (6)(1)(c) of the PLRA[7] and an official complaint was issued against the Borough by the Secretary on April 16, 2012 as Case No. PF–C–12–40–E. (IAFF Local 1813's Unfair Labor Practice Complaint and Notice of Hearing, Case No. PF–C–12–40–E (Union's Complaint), R.R. at 22a–28a.)

A hearing examiner heard both complaints together on June 18, 2012, but issued separate Proposed Decisions and Orders for each case. The hearing examiner found that, because the Union did not engage in an unlawful secondary boycott by issuing the Letter, the Union did not commit any unfair labor practices under Sec-

---

charges alleged that Chief Trace performed "fire & EMS duties within the operational jurisdiction of [the Union]" as a Franklin volunteer sixteen times between November 5, 2011 and April 16, 2012. (Hearing Joint Exhibit Q, R.R. at 380a.)

5. The Borough initially filed its unfair labor practices charge on December 23, 2011, but the Board's Secretary (Secretary) declined to issue a complaint on the basis that the Borough had failed to properly state a claim of unfair labor practices. (Chambersburg Borough's Unfair Labor Practice Complaint and Notice of Hearing, Case No. PF–C–11–174–E, R.R. at 3a.) On March 5, 2012, the Borough filed exceptions to the Secretary's decision, and the Board remanded the matter to the Secretary with instructions to issue the complaint. (Order Directing Remand to Secretary for Further Proceedings, R.R. at 5a–6a.)

6. Act of June 1, 1937, P.L. 1168, as amended, 43 P.S. §§ 211.6(2)(d), (e). Sections 6(2)(d) and (e) provide that "[i]t shall be an unfair labor practice for a labor organization" to "engage in a secondary boycott, or to hinder or prevent by threats, intimidation, force, coercion or sabotage the obtaining, use or disposition of materials, equipment or services" or "call, institute, maintain or conduct a strike or boycott against any employer or industry or to picket any place of business of the employer or the industry on account of any jurisdictional controversy." Id.

7. 43 P.S. §§ 211.6(1)(a), (c). Sections 6(1)(a) and (c) provide that "[i]t shall be an unfair labor practice for an employer" to "interfere with, restrain or coerce employes in the exercise of the rights guaranteed in" the PLRA and "[b]y discrimination in regard to hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization." Id.

tions 6(2)(d) or 6(2)(e). (Final Order at 6.) Finding no unprotected secondary boycott, the hearing examiner determined that Martin's suspension based on sending the Letter was discriminatory, resulting in unfair labor practices under Sections 6(1)(a) and 6(1)(c). (Final Order at 6.) The Borough filed timely exceptions to the hearing examiner's Proposed Decisions and Orders. (Complainant's Statement of Exceptions (Case No. PF–C–11–174–E), R.R. at 592a–98a; Respondent's Statements of Exceptions (Case No. PF–C–12–40–E), R.R. at 600a–09a.) The majority of the Board issued a Final Order on October 15, 2013, dismissing the Borough's exceptions and making final and absolute the hearing examiner's Proposed Decisions and Orders. (Final Order at 9.) In disposing of the Borough's exceptions, the Board determined as follows.

### Borough's Unfair Labor Practices Charge–PF–C–11–174–E

The Borough's Complaint against the Union alleged violations of Section 6(2)(d) of the PLRA.[8] Under Section 6(2)(d), it is an unfair labor practice for a labor organization "[t]o engage in a secondary boycott, or to hinder or prevent by threats, intimidation, force, coercion or sabotage the obtaining, use or disposition of materials, equipment or services." 43 P.S. § 211.6(2)(d). The Borough alleged that the Union committed a two-fold violation of Section 6(2)(d): first, by engaging in a secondary boycott; and second, by hindering fire prevention services through coercion of the volunteer firefighters.

In evaluating the charge of a secondary boycott, the Board did not specifically define what it means "[t]o engage in a secondary boycott" within the meaning of Section 6(2)(d). Instead, the Board applied *Dudek v. Pittsburgh City Fire Fighters, Local No. 1*, 425 Pa. 233, 228 A.2d 752 (1967), where several firemen brought an equity action against their union seeking an injunction to restrain the union from collecting fines imposed on the firemen for violating a union order. The paid firemen were employed by the City of Pittsburgh (City) and were all represented by the same union, which negotiated with the City. *Id.* at 753. The union ordered its member firemen to picket Democratic candidates for City Council whenever the candidates spoke at public meetings. *Id.* The union fined the members when they refused to picket the political candidates. *Id.* The court of common pleas granted the firemen's request for injunctive relief. *Id.* On appeal to the Supreme Court, the union argued that "a labor organization or any organization has the right to enforce the lawful demands of the majority by placing fair and reasonable penalties on those of its members who do not accept the decision of the majority." *Id.* (internal quotation marks omitted). Although the Supreme Court in *Dudek* concluded that the union's imposition of fines on the firefighters was *unreasonable* and, therefore, the fines were null and void, the Supreme Court also stated that:

> Nothing in this opinion is to be construed as denying to labor unions the right to discipline recalcitrant members in accordance with their constitutions and by-laws consonant with standards which meet the laws of the land. The Superior Court of Wisconsin well said ... "A union without power to enforce solidarity among its members, when it resorts to a strike in an effort to force an employer to agree to its collective[-]bargaining demands, is a much[-]less[-]effective instrument of col-

---

**8.** On appeal to this Court, the Borough does not challenge the Board's disposition of its unfair labor practice charge based upon Section 6(2)(e) of the PLRA.

lective bargaining than a union which possesses such power.... 'A union must have authority to discipline its members, otherwise it will have no power to bargain effectively.' "

*Dudek,* 228 A.2d at 756–57 (citation omitted). Based on this specific language, the Board reasoned that:

> In accordance with *Dudek,* a union's notice of, or imposition of disciplinary sanctions on, recalcitrant members would not be a secondary boycott. Indeed, Martin's letter of October 26, 2011 was not itself coercive. The October 26, 2011 letter only advises IAFF members of their obligations under the IAFF bylaws and constitution with which they agreed to abide. Accordingly, Martin's October 26, 2011 letter would not amount to a secondary boycott under Section 6(2)(d) of the PLRA.

(Final Order at 7.)

Additionally, the Board found that there could not be a secondary boycott in this instance because the third party, Franklin, was not "independent or unconnected with the labor dispute at issue." (Final Order at 7.) The Board stated that Franklin was an ally of the Borough because the volunteer firefighters of Franklin, who were IAFF members, would have fulfilled the Borough's fire service needs by replacing the paid firefighters whom the Borough intended to lay off. (Final Order at 8.)

One member of the Board dissented because he would have held that Martin's Letter "was coercive toward IAFF members and that the volunteers of [Franklin] were not allied with the Borough." (Final Order at 9 (Shoop, dissenting).) Accordingly, the dissent concluded that the Union engaged in a secondary boycott in violation of Section 6(2)(d) of the PLRA. (Final Order at 9 (Shoop, dissenting).)

### Union's Unfair Labor Practices Charge–PF–C–12–40–E

The Union's Complaint against the Borough alleged violations of Sections 6(1)(a) and 6(1)(c) of the PLRA. Section 6(1)(a) states that an employer may not "interfere with, restrain, or coerce employes in the exercise of the rights guaranteed in this act." 43 P.S. § 211.6(1)(a). Section 6(1)(c) states, in relevant part, that an employer may not "discriminat[e] in regard to. hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization...." 43 P.S. § 211.6(1)(c).

First, the Board addressed Section 6(1)(c). The Board reasoned that because the Letter was not a violation of Section 6(2)(d), it was protected activity. The Board also stated that the Letter "involved internal [U]nion matters discussing IAFF members' rights and obligations under the IAFF Constitution and Bylaws. Thus, Martin's [Letter] was protected activity under the PLRA." (Final Order at 9.) The Board pointed out that the Borough admitted that the basis of Martin's suspension was the Letter; therefore, the Board determined that "the Borough's discipline of Martin for engaging in that protected conduct amounts to interference and discrimination under Section 6(1)(a) or (c) of the PLRA." (Final Order at 9.)

■ The Borough now petitions this Court for review of the Board's Final Order.[9]

---

9. Our review is limited to determining whether constitutional rights have been violated, whether an error of law has occurred, and whether the findings of fact are supported by substantial evidence. *Pennsylvania State Troopers Association v. Pennsylvania Labor Relations Board,* 39 A.3d 616, 621 n. 6 (Pa. Cmwlth.2012).

*Discussion*

### 1. Section 6(2)(d)–Secondary Boycott

As stated previously, pursuant to Section 6(2)(d), it is an unfair labor practice for a labor organization *"[t]o engage in a secondary boycott,* or to hinder or prevent by threats, intimidation, force, coercion or sabotage the obtaining, use or disposition of materials, equipment or services." 43 P.S. § 211.6(2)(d) (emphasis added). The term "secondary boycott" is not defined in the PLRA and the meaning of the phrase "to engage in a secondary boycott" is an issue of first impression. However, because the PLRA is patterned after the National Labor Relations Act (NLRA),[10] *Kerr v. Butler Building Trades Council, AFL–CIO,* 447 Pa. 247, 288 A.2d 525, 528 (1972), in interpreting the PLRA our Courts have "not hesitated to consider, and to follow, federal interpretation of the NLRA," *Office of Administration v. Pennsylvania Labor Relations Board,* 591 Pa. 176, 916 A.2d 541, 550 (2007). Section 6(2)(d) of the PLRA is patterned after Section 8(b)(4) of the NLRA.[11] Although Section 8(b)(4) does not specifically use the term "secondary boycott," "[t]he conduct described in this section . . . is customarily referred to as a 'secondary boycott.'" *Kerr,* 288 A.2d at 527. Our Supreme Court has recognized that Section 6(2)(d), "like the national act, [ ] proscribes as an unfair labor practice conduct which amounts to a secondary boycott, 43 P.S. § 211.6(2)(d)." *Id.* at 528. Accordingly, in interpreting what it means under Section 6(2)(d) of the PLRA "to engage in a secondary boycott," we will look to the federal interpretation of Section 8(b)(4) of the NLRA.

"Section 8(b)(4) reflects the 'dual Congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures and controversies not their own.'" *Ozark Interiors, Inc. v. Carpenters Local No. 978,* 755 F.Supp. 875, 880 (W.D.Mo.1990)[12] (quoting *National Labor Relations Board v. Denver Building & Construction Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951)). Section 8(b)(4), provides, in pertinent part, as follows:

(b) Unfair labor practices by labor organization

It shall be an unfair labor practice for a labor organization or its agents—

. . . .

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . .: *Provided,* That nothing con-

---

**10.** 29 U.S.C. §§ 151–169.

**11.** 29 U.S.C. § 158(b)(4).

**12.** *Reversed and remanded on other grounds by,* 957 F.2d 566 (8th Cir.1992).

tained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

29 U.S.C. § 158(b)(4).

The Borough argues that Martin's Letter constituted an unlawful secondary boycott because the Letter exhorted fellow firefighters to stop fighting fires in the Borough. This, the Borough argues, is the very definition of a boycott. The Borough asserts further that Martin's Letter and the Union's conduct falls squarely within the established definition of a secondary boycott. The Borough argues that the Union, "through Mr. Martin's Letter, threatened and coerced numerous volunteer firefighters to force the Borough to cease doing business with the volunteer fire companies and, instead, to succumb to the [U]nion's wishes of maintaining its current paid staffing levels." (Borough's Br. at 31.) The Borough also argues that paid firefighters are prohibited by law from striking,[13] and that the Union's "attempt to coerce *any* firefighters to refrain from providing public safety services to a jurisdiction is abhorrent to the Legislature's prohibition of striking for firefighters and police officers." (Borough's Br. at 30 (emphasis in original).)

In response, the Board asserts that it did not err by interpreting the PLRA to hold that, in the absence of a strike or cessation of work by a neutral employer, for a labor organization to violate Section 6(2)(d) of the PLRA there must be threats, intimidation, force, coercion, or sabotage to hinder or prevent the obtaining, use or disposition of materials, equipment or services. The Board urges this Court to look to the provisions of the NLRA in inter-

preting the meaning of the phrase "to engage in a secondary boycott" as used in Section 6(2)(d). The Board asserts that, unlike the wording in Section 8(b)(4) of the NLRA, Section 6(2)(d) delineates "engaging in a secondary boycott" as a separate and distinct phrase from the remainder of this section. The remainder provides that it is an unfair labor practice for a labor organization "to hinder or prevent by threats, intimidation, force, coercion or sabotage the obtaining, use or disposition of materials, equipment or services." 43 P.S. § 211.6(2)(d). The Board argues that, because the phrase "to engage in a secondary boycott" is separate and distinct, this phrase cannot be read to expand beyond actually engaging in a strike or cessation of work. In other words, "there must be an actual work stoppage by [employees] of an employer resulting in a neutral employer ceasing to deal with an employer that is involved in a labor dispute." (Board's Br. at 29.) Any other interpretation, the Board argues, would render all of the language following the phrase "to engage in a secondary boycott" in Section 6(d)(2) superfluous.

Applying the foregoing interpretation, the Board asserts that because there was no cessation of services or labor in this case as is necessary to engage in a secondary boycott pursuant to Section 6(2)(d), the relevant factual inquiry is whether Martin's Letter contained threats, intimidation or coercion designed to hinder or prevent the Borough from obtaining volunteer services from Franklin. The Board argues that, in accordance with its Final Order, the Letter was not coercive, but merely directed the IAFF members to the IAFF Constitution and Bylaws and advised them

---

**13.** *See Alcaraz v. Pennsylvania Labor Relations Board*, 552 Pa. 605, 716 A.2d 1238, 1243 (1998) (stating that in exchange for the right to engage in collective bargaining pursuant to

what is commonly referred to as Act 111, Act of June 24, 1968, P.L. 237, 43 P.S. §§ 217.1–217.10, "no policeman or fireman has the right to strike").

of their obligations under these documents with which they agreed to abide. Therefore, the Board asserts, it did not err in concluding that the Borough failed to establish a violation of Section 6(2)(d) of the PLRA.

▪ "Essentially [Section 8(b)(4) of the NLRA] means that it is unlawful for a labor organization to induce employees of a neutral employer to strike *or for a labor organization to pressure a neutral employer where the object of the union is to force such employer to cease doing business with another employer....*" *Sheet Metal Workers' International Association, Local Union No. 223, AFL–CIO v. Atlas Sheet Metal Company of Jacksonville,* 384 F.2d 101, 105 (5th Cir.1967) (emphasis added). The United States Supreme Court has explained that Section 8(b)(4)(i) condemns "union pressures calculated to induce the employees of a secondary employer to withhold their services in order to force their employer to cease dealing with the primary employer." *National Labor Relations Board v. Servette, Inc.,* 377 U.S. 46, 52–53, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964). This condemned conduct includes inducing or encouraging employees of the secondary employer not only to strike, but to refuse to perform any services. 29 U.S.C. § 158(b)(4)(i). "[T]he [U]nion's conduct violates [Section] 8(b)(4) if its object is to force the secondary employer to refrain from dealing with the primary employer." *Cliff House Building Corporation, Inc. v. Plumbers Union Local 690,* 232 Pa.Super. 533, 336 A.2d 339, 344 (1975) (Hoffman, J., concurring). However, a violation of Section 8(b)(4) "does not depend upon the success or failure of the union efforts in achieving the prohibited objective." *Burr v. National Labor Relations Board,* 321 F.2d 612, 621 (5th Cir.1963). A strike or work stoppage need not to have occurred to prove that a labor organization induced or encouraged employees to withhold services. *Lescher Building Service, Inc. v. Local Union No. 133 of the Sheet Metal Workers International Association,* 310 F.2d 331, 336 (7th Cir.1962); *Alpert v. Local 660, International Brotherhood of Electrical Workers, AFL–CIO,* 169 F.Supp. 384, 387 (D.Conn.1959). "[T]his is because it is the inducement to strike that counts." *Alpert,* 169 F.Supp. at 387.

▪ Accordingly, we decline to hold that there must be an actual strike or work stoppage in order to find that a labor organization has engaged in a secondary boycott within the meaning of the first clause of Section 6(2)(d) of the PLRA. In keeping with the federal interpretation of Section 8(b)(4)(i) and what it means to engage in a secondary boycott under that subsection, we hold that the phrase "to engage in a secondary boycott" as set forth in Section 6(2)(d) of the PLRA proscribes "union pressures calculated to induce [or encourage] the employees of a secondary employer to withhold their services in order to force their employer to cease dealing with the primary employer." *Servette,* 377 U.S. at 52–53, 84 S.Ct. 1098. Also in keeping with federal interpretation, a strike or work stoppage need not have actually occurred to prove that a labor organization induced or encouraged employees to withhold their services from their secondary employer. *Lescher,* 310 F.2d at 336; *Alpert,* 169 F.Supp. at 387. Because an actual strike or work stoppage need not actually occur, the fact that paid firefighters are prohibited by law from striking would not preclude a finding that a labor organization representing paid firefighters has engaged in conduct that constitutes a secondary boycott within the meaning of Section 6(2)(d) of the PLRA by inducing volunteer firefighters to stop work.

We further conclude that, contrary to the Board's contention, our holdings with respect to the first clause of Section 6(2)(d) of the PLRA do not render the second clause of Section 6(2)(d) superfluous. The second clause of Section 6(2)(d) provides that it is an unfair labor practice to "to hinder or prevent by threats, intimidation, force, coercion or sabotage, the obtaining, use or disposition of materials, equipment or services." 43 P.S. § 211.6(2)(d). This language is similar to Section 8(b)(4)(ii) of the NLRA, which requires that a labor organization engage in more than inducement or encouragement. 29 U.S.C. § 158(b)(4)(ii). To violate Section 8(b)(4)(ii), the labor organization must engage in conduct that threatens, coerces or restrains the secondary employer. *Id.; Servette,* 377 U.S. at 54, 84 S.Ct. 1098. Thus, the second clause of Section 6(2)(d) of the PLRA and Section 8(b)(4)(ii) of the NLRA require a more strict standard of coercion or threats in order to find a violation. *Herbert Burman, Inc. v. Local 3 International Brotherhood of Electrical Workers, AFL–CIO, Local 144,* 214 F.Supp. 353, 359 (D.N.Y.1963). Because of the differentiation between the two standards—inducement versus coercion—our interpretation of Section 6(2)(d) gives both clauses full effect.

We now turn to the question of whether the Union committed an unfair labor practice in violation of the first clause of Section 6(2)(d) by engaging in a secondary boycott.[14] We note initially that the Board does not assert that a remand would be necessary for the Board to determine whether the Union induced or encouraged the Franklin volunteer firefighters to withhold their services from Franklin if this Court held that the first clause of Section 6(2)(d) was applicable in this matter. The Board determined that Martin's Letter "would not amount to a secondary boycott under Section 6(2)(d) of the PLRA" because the Letter only advised the IAFF members of their obligations under the IAFF Constitution and Bylaws. (Final Order at 7.) In light of this determination, we again refer to the federal interpretation of the NLRA to determine whether a union's right to advise its members of their obligations could amount to a secondary boycott in violation of Section 8(b)(4).

In this regard, the Ninth Circuit has held that "coercive disciplinary action against union members who fail to abide by union bylaws" may, under certain circumstances, be considered as an attempt to institutionalize, through disciplinary action, collective secondary pressure in violation of Section 8(b)(4) of the NLRA. *National Labor Relations Board v. Glaziers and Glassworkers Local Union No. 1621,* 632 F.2d 89, 91 (9th Cir.1980). In *Glaziers,* the Ninth Circuit examined whether a union violated Section 8(b)(1)(A) of the NLRA[15] by disciplining its members who worked at a construction site for a neutral employer. *Id.* at 90. The union fined two of its members $300 each after finding them guilty of working at a site where members of another union were picketing. *Id.* The two union members challenged the discipline and the National Labor Rela-

---

14. The Board does not contend that the Franklin volunteer firefighters are not employees within the meaning of the PLRA.

15. 29 U.S.C. § 158(b)(1)(A). Section 8(b)(1)(A) provides as follows:

It shall be an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein.

*Id.*

tions Board (NLRB) found that the discipline "restrained and coerced them in the exercise of their section 7 rights within the terms of section 8(b)(1)(A)." [16]  *Id.* The NLRB then filed an application for enforcement of its order finding the union guilty of an unfair labor practice.

In enforcing the NLRB's order, the Ninth Circuit recognized a union's right to discipline its members; however, it also reiterated that "[w]hen application of a union rule is found to run contrary to national labor policy, 'the disciplinary action is regarded as coercive within the meaning of section 8(b)(1)(A).'" *Id.* at 91 (quoting *National Labor Relations Board v. Retail Clerks Union, Local 1179, Retail Clerks International Association, AFL–CIO,* 526 F.2d 142, 145 (9th Cir.1975)). With the foregoing in mind, the Ninth Circuit upheld the NLRB's finding "that the enforcement of a union rule prohibiting union members from working for a neutral employer at a construction site tend[ed] to frustrate the national labor policy against secondary boycotts" set forth in Section 8(b)(4) of the NLRA. *Id.* The Ninth Circuit determined that the union obviously "was attempting to institutionalize collective secondary pressure through its disciplinary machinery." *Id.* The Ninth Circuit stated that a decision to the contrary would undermine a secondary employer's right to remain neutral. *Id.* at 93.

■  Here, the Letter sent by Martin on behalf of the Union specifically emphasizes that the Union would take any action both necessary and legal, which they did by bringing internal misconduct charges against ten Franklin volunteers for continuing to volunteer in the Borough. (Hearing Joint Exhibit Q, R.R. at 379a–98a.)  Thus, the Union used its disciplinary

machinery to induce and encourage the Franklin volunteers to refrain from providing fire prevention and emergency services when Franklin was called upon to assist the Borough.  As with the NLRA, the use of discipline by the Union under the circumstances of this case tends to frustrate the Commonwealth's policy against secondary boycotts set forth in Section 6(2)(d) of the PLRA.

As stated previously, the Borough and Franklin have a mutual aid agreement and the record reflects the degree to which the Borough relies on Franklin's volunteers for their expertise and life-saving equipment that the Borough does not possess. Franklin has the only heavy rescue equipment available to the entire Borough.  (Final Order at 2.)  Chief Trace testified that "[t]he rescue squad carries specialty equipment and manpower that the Borough currently does not have.  [The rescue squad] operate[s] mainly to rescue occupants from burning buildings or trapped in vehicles or that type of scenario."  (Hr'g Tr. at 109, R.R. at 168a.)  Jeffrey Stonehill, the Borough Manager and Director of Utilities for the Borough, testified that "[v]olunteers are the most important part of the Chambersburg Fire Department" because "[t]hey provide the largest amount of manpower for responding to fires...."  (Hr'g Tr. at 22, R.R. at 81a.)  Mr. Stonehill also testified that Franklin is the "best trained, most well[-]staffed of the volunteer fire companies chartered in the Borough of Chambersburg."  (Hr'g Tr. at 24, R.R. at 83a.)  William McLaughlin, the Borough's town council president, testified that "at any fire scene, the number of volunteers typically outnumber the number of professional firefighters on scene."  (Hr'g Tr. at 83, R.R. at 142a.)

---

**16.** Section 7 of the NLRA, 29 U.S.C. § 157, provides employees with the right to engage

in, or refrain from, concerted activities.

Additionally, the Board found that there are seventy-four active members of Franklin, fourteen of which respond to calls within the Borough. (Final Order at 2.) Of those fourteen volunteers who respond to Borough emergencies, twelve of them are IAFF members. (Final Order at 2.) Martin's Letter was received by all of the Franklin members who are also IAFF members. (Final Order at 2.) Therefore, twelve of the fourteen Franklin volunteers who respond to calls within the Borough were affected by Martin's Letter, leaving only two members able to continue to provide volunteer fire fighting services within the Borough.

The foregoing supports the conclusion that Martin's Letter induced the Franklin volunteer firefighters to withhold essential firefighting services in order to force Franklin to abandon its obligations under the mutual aid agreement between the Borough and Franklin. In other words, the objective of the Letter was to force Franklin to refrain from dealing with the Borough in accordance with the mutual aid agreement so that the Borough would no longer have the equipment and manpower necessary to protect its citizenry. This reduction in equipment and manpower would force the Borough not to furlough paid firefighters. As such, the Union engaged in a secondary boycott when it sent the Letter to the Franklin volunteer firefighters, who are members of the IAFF, inducing them to refrain from responding to fires in the Borough.

■ However, this does not end our inquiry. The secondary employer must be neutral. In order for the "secondary employer" to be considered neutral, it cannot be "affiliated or allied with the primary employer." *Sheet Metal Workers,* 384 F.2d at 105. This means that

> [t]he secondary employer must be ... 'wholly unconcerned' in the dispute between a primary employer and his employees. This neutrality of the secondary employer is destroyed and it is deemed to be an ally of the primary employer for the purpose of section 8(b)(4) where there is actual common control exemplified by domination of the secondary by the primary employer or an overlapping of management functions and not merely potential common control inherent in common ownership.

*Id.* A secondary employer may also be considered an ally of the primary employer where the employees of the secondary employer are performing work that would normally be performed by the striking employees of the primary employer. *Laborers' International Union of North American, Local 859, AFL–CIO v. National Labor Relations Board,* 446 F.2d 1319, 1321 (D.C.Cir.1971).

■ The Borough argues that the ally doctrine does not apply where struck work could not possibly exist and where the Borough and Franklin maintain separate existences. Moreover, no layoffs of paid firefighters occurred despite the Borough notifying the Union that it was considering eliminating some firefighter positions due to budgetary concerns. Thus, the Borough contends, at the time Martin sent the Letter, no paid firefighters had been furloughed and no strike existed against the Borough. Therefore, the Board erred by concluding that the ally doctrine applied.

In response, the Board argues that its adoption of an "ally doctrine" like labor policy that conforms to public sector employment was not erroneous. The Board concedes that application of the ally doctrine in the private sector is geared toward strike situations and that firefighters cannot strike; however, the Board contends that this distinction supports its adoption of an ally doctrine that conforms to Pennsylvania labor laws. Because firefighters

cannot strike, the Board extends the ally doctrine to situations that would involve removal of bargaining unit work and argues that the adoption of the doctrine prevents attempts by employers, such as the Borough's stated intent here, to engage in an unlawful removal of bargaining unit work. In applying the ally doctrine, the Board found that the Borough's intent to lay off its paid firefighters and replace them with Franklin volunteers caused the volunteers to lose their neutral status for purposes of the ally doctrine defense. The Board contends that it was the Borough's stated intent to engage in an unfair labor practice of unilaterally replacing its firefighters with volunteers that drew the volunteers into the primary dispute over layoffs between the Union and the Borough.[17] This course of action by the Borough resulted in the volunteers becoming allied with the Borough in regard to the layoff of Borough firefighters. Thus, the Board argues, it correctly concluded that the Borough failed to establish that the Union committed an unfair labor practice for engaging in a secondary boycott in violation of Section 6(2)(d) of the PLRA.

Upon review, we conclude that Franklin is not allied with the Borough. First, there was no actual layoff of the Borough's firefighters; therefore, Franklin's volunteer firefighters were not performing either "struck work" or bargaining unit work that would normally have been performed by the Borough's paid firefighters. Second, although there is a mutual aid agreement between the Borough and Franklin, there is no evidence that there is actual common control exemplified by domination of Franklin by the Borough or an overlapping of management functions. In addition, the Board determined that: (1) Franklin operates from its own separate building located in the Borough and uses its own equipment; and (2) the Borough does not exert any administrative control over the Franklin volunteers. (Final Order at 2.)

Accordingly, we conclude that the Board erred by not finding that the Union engaged in a secondary boycott in violation of the first clause of Section 6(2)(d) of the PLRA.[18] We now turn to the issue of whether the Board erred by finding that the Borough violated Section 6(1)(a) and Section 6(1)(c) of the PLRA.

### 2. Section 6(1)(a) and Section 6(1)(c)

We must first address the Borough's argument that the Board did not have jurisdiction to hear the Union's Complaint regarding Section 6(1)(a) and (c) violations because the Borough's defenses rest primarily on provisions of the CBA and the interpretation of contractual agreements is properly left to an arbitrator, not the Board. However, this Court has held that the Board is not devoid of jurisdiction "merely because a collective bargaining agreement exists under which grievance arbitration is available for the determination of issues similar to those upon which the charges are based."

---

**17.** We note that this matter does not involve whether the Borough's notice to the Union that it was going to furlough some of the paid firefighters constituted an unfair labor practice and the Board rendered no decision in that regard. Thus, the Board's assertion that the Borough's stated intent was to engage in an unfair labor practice by unilaterally replacing its firefighters with volunteers is not supported by the record in this matter.

**18.** Based on our conclusion that the Union violated Section 6(2)(d) within the meaning of the first clause of this section by engaging in a secondary boycott, we need not address whether the Union violated the second clause of Section 6(2)(d) by hindering or preventing "by threats, intimidation, force, coercion or sabotage, the obtaining, use or disposition of materials, equipment or services." 43 P.S. § 211.6(2)(d).

*Pennsylvania Labor Relations Board v. General Braddock Area School District,* 33 Pa.Cmwlth. 55, 380 A.2d 946, 950 (1977). Actions which violate a contract may also violate the PLRA. In such cases, "the [Board] will review an agreement to determine whether the employer clearly has repudiated its provisions because such repudiation may constitute both an unfair labor practice and a grievance." *Pennsylvania State Troopers Association v. Pennsylvania Labor Relations Board,* 761 A.2d 645, 649 (Pa.Cmwlth.2000). If the Board determines that there is no clear repudiation, but instead that the party charged presented a sound arguable basis for its conduct, the Board will dismiss the charges of unfair labor practices and the issue then becomes one of contractual interpretation to be addressed in arbitration. *Id.* at 650. Therefore, the Board had proper jurisdiction to hear the Section 6(1)(a) and 6(1)(c) charges against the Borough, regardless of whether the Borough was asserting contractual privilege as a defense.

■ We now turn to the Board's finding that the Borough violated Sections 6(1)(a) and 6(1)(c) because Martin's Letter was the basis of his suspension and the Letter was protected under the PLRA. Because we have concluded that the Union committed an unfair labor practice in violation of Section 6(2)(d) of the PLRA by engaging in a secondary boycott, we further conclude that Martin's Letter was not protected under the PLRA. Thus, the Board also erred in finding that the Borough committed violations of Sections 6(1)(a) or 6(1)(c) by disciplining Martin for sending the Letter. Accordingly, the Bor-

ough was within its rights to discipline Martin.[19]

For the foregoing reasons, the Board's Final Order is reversed.

### *ORDER*

**NOW,** December 4, 2014, the Final Order of the Pennsylvania Labor Relations Board entered in the above-captioned matter is **REVERSED.**

DISSENTING OPINION BY Senior Judge FRIEDMAN.

Because the majority has exceeded this court's scope of review in reversing the determination of the Pennsylvania Labor Relations Board (Board) and has ignored the plain language of Section 6(2)(d) of the Pennsylvania Labor Relations Act (PLRA),[1] which states that it shall be an unfair labor practice "[t]o *engage* in a secondary boycott," (emphasis added), I respectfully dissent.

In determining the meaning of "secondary boycott" as contained in Section 6(2)(d) of the PLRA, the majority relies on federal interpretation of Section 8(b)(4) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(4). Section 6(2)(d) of the PLRA provides that it shall be an unfair labor practice:

> To *engage* in a secondary boycott, *or* to hinder or prevent by threats, intimidation, force, coercion or sabotage the obtaining, use or disposition of materials, equipment or services, or to combine or conspire to hinder or prevent by any means whatsoever, the obtaining, use or disposition of materials, equipment or services.

---

19. As stated previously, Martin's suspension was upheld by the Borough's Civil Service Commission and was the subject of binding grievance arbitration.

1. Act of June 1, 1937, P.L. 1168, *as amended,* 43 P.S. § 211.6(2)(d).

43 P.S. § 211.6(2)(d) (emphasis added). However, Section 8(b)(4) of the NLRA, which does not contain the language "secondary boycott," prohibits a labor organization "to engage in, *or to induce or encourage any individual ... to engage in, a strike....*" 29 U.S.C. § 158(b)(4) (emphasis added).

By its terms, the first clause of Section 6(2)(d) of the PLRA requires participation in a work stoppage. A work stoppage did not occur in this case. Unlike Section 8(b)(4) of the NLRA, Section 6(2)(d) of the PLRA does not contain the words "induce or encourage." Therefore, I would agree with the Board that an actual strike or cessation of services by a neutral employer must occur for a labor organization to violate the first clause of Section 6(2)(d) of the PLRA. Thus, I strenuously disagree with the majority's holding that the phrase " 'to engage in a secondary boycott' as set forth in Section 6(2)(d) of the PLRA proscribes 'union pressures calculated to induce [or encourage] the employees of a secondary employer to withhold their services in order to force their employer to cease dealing with the primary employer.' " (Maj. Op. at 223 (quoting *National Labor Relations Board v. Servette, Inc.,*

377 U.S. 46, 52–53, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964)).) While Section 8(b)(4) of the NLRA prohibits a labor organization to "induce or encourage" a strike, such language is *not* present in Section 6(2)(d) of the PLRA.[2]

"Our scope of review is limited. A decision of the Board must be upheld if the Board's findings are supported by substantial evidence, and if the conclusions drawn from those facts are reasonable, and not capricious, arbitrary[,] or illegal." *Joint Bargaining Committee of the Pennsylvania Social Services Union v. Pennsylvania Labor Relations Board,* 503 Pa. 236, 469 A.2d 150, 152 (1983). Further, this court " 'will not lightly substitute its judgment for that of a body selected for its expertise whose experience and expertise make it better qualified than a court of law to weigh facts within its field.' " *Borough of Ellwood City v. Pennsylvania Labor Relations Board,* 606 Pa. 356, 998 A.2d 589, 594 (2010) (citation omitted).

The majority has exceeded this court's scope of review. Based on the Board's findings, I would conclude that the Local 1813 Union, via issuance of the letter, did not *engage* in a secondary boycott. Ac-

**2.** Moreover, although the majority relies on *National Labor Relations Board v. Glaziers and Glassworkers Local Union No. 1621,* 632 F.2d 89 (9th Cir.1980), and *National Labor Relations Board v. Retail Clerks Union, Local 1179, Retail Clerks International Association, AFL–CIO,* 526 F.2d 142 (9th Cir.1975), for the proposition that "the use of discipline by the [Local 1813] Union under the circumstances of this case tends to frustrate the Commonwealth's policy against secondary boycotts set forth in Section 6(2)(d) of the PLRA," (Maj. Op. at 225), those cases are distinguishable. Specifically, those cases involved a union member challenging discipline imposed by the union. This case does not involve a challenge to the union's discipline. Rather, the issue here is whether a letter sent to firefighters, reminding them of their union obligations, constitutes an unfair labor practice.

Additionally, this court's limited scope of review of a Board decision differs from that of a federal appeals court. Federal courts of appeal will uphold the decision of the National Labor Relations Board (NLRB) if the NLRB's findings of fact are supported by substantial evidence and if the NLRB correctly applied the law. *National Labor Relations Board v. General Truck Drivers, Warehousemen, Helpers and Automotive Employees of Contra Costa County,* 20 F.3d 1017, 1021 (9th Cir.1994). The federal appeals court "defer[s] to the [NLRB's] interpretation of the NLRA where that interpretation is 'reasonably defensible.' " *Washington State Nurses Association v. National Labor Relations Board,* 526 F.3d 577, 580 (9th Cir.2008) (citation omitted).

cordingly, I would affirm the Board's decision.[3]

---

**3.** I would further conclude that the Board correctly determined that the Union did not violate the second clause of Section 6(2)(d) of the PLRA by "hinder[ing] or prevent[ing] by threats, intimidation, force, coercion or sabotage the obtaining, use or disposition of … equipment or services…." 43 P.S. § 211.6(2)(d). Also, I would affirm the Board's determination that Chambersburg Borough committed an unfair labor practice under Sections 6(1)(a) and (c) of the PLRA, 43 P.S. § 211.6(1)(a) and (c).